860 A.2d 1

In re NOMINATION Paper OF Ralph NADER and Peter Miguel Camejo as Candidates of an Independent Political Body for President and Vice President in the General Election of November 2, 2004.

Linda S. Serody, Roderick J. Sweets, Ronald Bergman, Richard Trinclisti, Terry Trinclisti, Bernie Cohen–Scott, Donald G. Brown and Julia A. O'Connell.

Appeal of Ralph Nader and Peter Miguel Camejo, and Their Independent Electors.

Supreme Court of Pennsylvania.

Oct. 19, 2004.

Michelle Stirman Pierson, Esq., Marcus James Lemon, Esq., J. Matthew Wolfe, Esq., Ronald Lee Hicks, Jr., Esq., Andrew Lee Noble, Michael Edward Barrett, Basil Culyba, *pro hac vice*, Ross A. Dreyer, *pro hac vice*, James L. Cook, III, for & Peter Miguel Camejo Ralph Nader.

Jeffrey John Bresch, Esq., William S. Gordon, Esq., Christopher K. Walters, Esq., Daniel I. Booker, Esq., Ira Steven Lefton, Esq., Pittsburgh, for Linda S. Serody.

Jeremy David Feinstein, Esq., Milind Madhukar Shah, Esq., Barbara Kiely, Esq., Pittsburgh, for Roderick J. Sweets.

Efrem M. Grail, Esq., Nicholas R. Sabatine, III, Esq., Pittsburgh, for Ronald Bergman.

Cynthia E. Kernick, Esq., James Michael Doerfler, Esq., Andrea Beth Simonson, Pittsburgh, for Richard Trinclisti.

Melissa Joy Oretsky, Philadelphia, for Bernie Cohen–Scott.

Mark Lawrence Tamburri, Esq., John M. McIntyre, Pittsburgh, for Terry Trinclisti.

Kim M. Watterson, Esq., Lisa M. Campoli, James P. Williamson, Pittsburgh, for Donald G. Brown.

Brian Anthony Gordon, Esq., Gregory M. Harvey, Esq., Philadelphia, for Julia A. O'Connell.

Louis Lawrence Boyle, Esq., for Bureau of Commissions, Elections and Legislation.

Gerald J. Pappert, Esq., Harrisburg, for Commonwealth of PA.

BEFORE: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

### *ORDER*

PER CURIAM.

**AND NOW,** this 19th day of October, 2004, the Order of the Commonwealth Court dated October 13, 2004, is affirmed. The Application For Supersedeas is denied. The Application For Intervention is dismissed as moot.

Justice SAYLOR dissents. Dissenting Statement to Follow.

Justice SAYLOR.

On October 19, 2004, a majority of this Court entered a *per curiam* Order affirming the Commonwealth Court's decision to set aside the nomination papers of Ralph Nader and Peter Miguel Camejo, thus removing them as candidates of an independent political body for President and Vice President in the general election of November 2, 2004. I noted my dissent to this Order, consistent with my belief that, in determining that the candidates' nomination papers were defective, the Commonwealth Court misconstrued relevant statutory authority, thereby assessing the candidates' submissions according to a standard that was more stringent than that which has been prescribed by the Pennsylvania General Assembly. Specifically, it is my position that the Commonwealth Court incorrectly construed the term "qualified elector," as used in the Pennsyl-

vania Election Code,[1] to subsume a requirement of actual voter registration.

By way of further background, pursuant to this Court's Order dated September 29, 2004, *see In re Nomination Papers of Nader,* 580 Pa. 22, 858 A.2d 1167 (2004), the Commonwealth Court set out to assess whether objectors to the candidates' nomination papers had satisfied their burden to establish that, of the 51,273 signatures presented on the face of the candidates' submissions, at least 25,577 failed to meet requirements of the Election Code, such that the candidates lacked the 25,697 valid signatures necessary to gain ballot access. *See* 25 P.S. § 2911. *See generally Nader,* 580 Pa. at 27 n. 1, 858 A.2d at 1170 n. 1. In devising a protocol for this substantial undertaking, the Commonwealth Court determined, *inter alia,* that the Election Code requires that each signator on a nomination paper seeking ballot access for representatives of independent political bodies must be a registered voter in Pennsylvania. *See In re Nomination Paper of Nader,* No. 568 M.D.2004 (Pa.Cmwlth.Sept.20, 2004) (*per curiam* order). In other words, the court implemented a registration standard to guide its signature review. As of the commencement of the review process, the candidates challenged this registration standard on the basis that it was not supported by the Election Code and concurrently sought this Court's review of this challenge under an exercise of its extraordinary jurisdiction.[2] Via *per curiam* Order dated October 1, 2004, this Court declined to invoke its extraordinary jurisdiction, and at such time, I filed a concurring and dissenting statement expressing the view that the candidates' challenge to the registration standard appeared to have substantial merit. *See In re Nomination Papers of Nader,* 171 MM

1. Act of June 3, 1937, P.L. 1333 (as amended, 25 P.S. §§ 2600–3591) (the "Election Code").

2. There are legitimate issues concerning the timeliness of the candidates' challenge to the Commonwealth Court's implementation of a registration standard in the signature review process, which led the Commonwealth Court to conclude that the challenge had been waived. Accordingly, I have addressed the waiver concern in the discussion below.

2004 (Pa. October 1, 2004) (concurring and dissenting statement). Accordingly, I also indicated that I would direct the Commonwealth Court to separately review whether the objectors satisfied their burden with respect to each signature, assuming that voter registration was not required. My aim in this respect was to preserve the opportunity for meaningful appellate review of the objections to the candidates' nomination papers should this Court at such juncture determine that a "qualified elector," as used in the Election Code, need not be a registered voter. The signature review process went forward, nevertheless, with the registration standard in place.

The Commonwealth Court derived the registration standard from Section 951 of the Pennsylvania Election Code, which pertains to independent political bodies (as opposed to major political parties), and interposes the central requirement for a valid signature on a nomination paper of status of the signator as a "qualified elector." *See* 25 P.S. § 2911(c).[3] The Election Code, however, defines "qualified elector" with reference to the criteria enumerated in the Pennsylvania Constitution pertaining to factors such as age, citizenship, and residency; the definition does not contain an express requirement of voter registration. In particular, Section 102(t) of the Code states that a "qualified elector" is

any person who shall possess all of the qualifications for voting now or hereafter prescribed by the Constitution of this Commonwealth, or who, being otherwise qualified by continued residence in his election district, shall obtain such qualifications before the next ensuing election.

25 P.S. § 2602(t). The relevant constitutional provision specifies that:

3. Also at issue in this case are signatures stricken because the circulator of the petition on which they appeared was not registered to vote (circulators, as well as signers, are subject to "qualified elector" status pursuant to Section 951, *see* 25 P.S. § 2911(d)). For ease of discussion, and as the number of signatures stricken based on circulator status is minimal in comparison to those stricken based on the status of the signator, I have confined my discussion to the signator context, while merely noting here that the analysis applies equally to the petition circulators.

Every citizen 21 years of age [lowered to 18 years of age by the twenty-sixth amendment to the United States Constitution], possessing the *following qualifications,* shall be *entitled* to vote at all elections subject, however, to such laws requiring and regulating the registration of electors as the General Assembly may enact.

1. He or she shall have been a citizen of the United States at least one month.

2. He or she shall have resided in the State 90 days immediately preceding the election.

3. He or she shall have resided in the election district where he or she shall offer to vote at least 60 days immediately preceding the election, except that if qualified to vote in an election district prior to removal of residence, he or she may, if a resident of Pennsylvania, vote in the election district from which he or she removed his or her residence within 60 days preceding the election.

PA. CONST. art. VII, § 1 (emphasis added).

Based on Article VII, Section 1's proviso "subject ... to such laws requiring and regulating the registration of electors as the General Assembly may enact," the Commonwealth Court, and the objectors, have adopted the view that the qualifications enumerated were subject to legislatively-enacted regulations, and hence, a person cannot be a qualified elector unless registered to vote. However, a straightforward reading of the constitutional text reveals that the qualifications in view are those which are listed within the constitutional provision itself (i.e., in subsections 1, 2 and 3 of Article VII, Section 1), whereas the legislatively-enacted regulations are authorized via the introductory proviso to control the elector's *entitlement* to vote once the elector possesses the necessary *qualifications* to exercise the franchise.

Section 701 of the Election Code, which codifies virtually word-for-word the constitutional recitation of the qualifications of an elector, confirms this view:

### § 2811. Qualifications of electors

Every citizen of this Commonwealth eighteen years of age, possessing the following qualifications, shall be entitled to vote at all elections, providing he or she has complied with the provisions of the acts requiring and regulating the registration of electors:

(1) He or she shall have been a citizen of the United States at least one month.

(2) He or she shall have resided in the State ninety days immediately preceding the election.

(3) He or she shall have resided in the election district where he or she shall offer to vote at least thirty days immediately preceding the election, except that if qualified to vote in an election district prior to removal of residence, he or she may, if a resident of Pennsylvania, vote in the election district from which he or she removed his or her residence within thirty days preceding the election.

25 P.S. § 2811. Like Article VII, Section 1 of the Constitution, this provision dictates that voting "qualifications" pertain to age, citizenship, and residency, whereas, ultimately, entitlement to vote is contingent upon compliance with voter-registration requirements extrinsic to Section 701. Indeed, Section 701 is, if anything, even more explicit in this regard than the constitutional text on which it is based, as it clarifies that compliance with registration requirements is only relevant to the entitlement aspect, and does not pertain to voter "qualifications."

This distinction between a qualified elector and a registered voter is recognized elsewhere in the Election Code as well. For example, the Code specifies that any "qualified elector" in the military may vote in primary elections "regardless of whether he is registered or enrolled," but that a military spouse or dependent who is a "qualified elector" may only vote if he or she is also "registered or enrolled according to law." 25 P.S. § 3146.1(a, b). This demonstrates that the General Assembly contemplated that some qualified electors would not be registered to vote. Conversely, the Election Code recognizes that some individuals who are in fact registered to vote—and are thus "registered electors"—may not be quali-

fied electors because they lack the inherent qualifications to vote. *See* 25 P.S. § 3523. This again demonstrates that the General Assembly assumed that there was a distinction between qualification to vote and registration to vote.[4]

Furthermore, in *In re Sullivan*, 307 Pa. 221, 160 A. 853 (1932), this Court recognized the distinction between "qualification" to vote and "entitlement" to vote when interpreting substantively similar—and structurally identical—language in

4. Also supporting this interpretation, the Election Code designates certain functions as available only to "qualified registered electors," or simply, "registered electors." *See, e.g.*, 25 P.S. §§ 2625 (members of State Plan Advisory Board must be "registered electors"), 2642 (Secretary of State must publicly report the number of "registered electors" in each party), 2672 (election officers must be "qualified registered electors" of the district in which they are appointed), 2674 (voting machine inspectors must be "qualified registered electors" of the county), 2675 (election board vacancies must be filled by "qualified registered electors" of the county), 2685 (five "registered electors" must sign any petition requesting overseers), 2687 (poll watchers must be "qualified registered electors" of the county), 2702 (newly formed election districts must contain between 100 and 1,200 "registered electors"), 2703 (twenty "registered electors" are needed on a petition to divide or alter an election district), 2726 (ten "qualified registered electors" are needed on a petition to alter an election district's polling place), 2730 (setting the minimum number of voting booths based upon the number of "qualified registered electors" in the voting district), 2967 (one book of 50 ballots must be provided for every 45 "registered electors" in an election district), 3031.2 (by majority vote of its "qualified registered electors," a municipality may institute electronic voting at primaries throughout the municipality), 3103.5 (ten "qualified registered electors" are needed to request reexamination of a previously-approved electronic voting system), 3056 ("registered electors" may demonstrate how to vote), 3146.2 (some absentee ballot applications may be from "qualified electors," while others must be from "qualified registered electors"), 3146.6 (affidavit of absentee voter who is later able to vote in person must declare that he or she is a "qualified registered elector"); 3160 (election returns for certain municipal elections must be certified to the county where the majority of "registered electors" of the municipality reside); 3313 (100 "registered electors" are required for an election contest petition to be laid before the General Assembly); 3377 (50 "registered electors" are required to complain of an illegal primary or judicial election or false election return); 3402 (20 "registered electors" are required to complain of an illegal election for representative in Congress or either house of the state legislature or false election return). The use of the phrase "qualified registered electors" would constitute surplusage if, as the objectors argue, the General Assembly intended the separate term "qualified elector" to have an identical meaning.

a prior version of the Pennsylvania Constitution.[5] In that matter, the trial court had granted an objector's request to set aside a nominating petition on the basis that a certain number of the signatures on the petition were from persons who were otherwise qualified to vote, but who were not registered. This Court reversed, explaining:

> We cannot agree ... that registration is an essential qualification of an elector. The reference which is made to registration in the first paragraph of the section of the Constitution just quoted [*i.e.*, the former Article 8, Section 1, *see supra* note 5] does not require such a narrow construction of the phrase "qualified elector." Registration may be and usually is prerequisite to voting; but it is not a qualification for the exercise of the franchise. No attorney is permitted to argue before the bar of this court without being formally admitted; yet no one would contend that the mere motion for admission constitutes a qualification for practice. The same reasoning applies to registration for voting.

*Id.* at 224–25, 160 A. at 854.[6]

This conclusion follows naturally from recognition that, historically, the concept of qualification to vote was a matter that

**5.** The constitutional provision interpreted in *Sullivan* stated as follows:
Every male citizen twenty-one years of age, possessing the following qualifications, shall be entitled to vote at all elections, subject however er to such laws requiring and regulating the registration of electors as the General Assembly may enact:
1. He shall have been a citizen of the United States at least one month.
2. He shall have resided in the State one year (or, having previously been a qualified elector or native born citizen of the State, he shall have removed therefrom and returned, then six months), immediately preceding the election.
3. He shall have resided in the election district where he shall offer to vote at least two months immediately preceding the election.
4. If twenty-two years of age and upwards, he shall have paid within two years a State or county tax, which shall have been assessed at least two months and paid at least one month before the election.
PA. CONST. of 1874, art. VIII, § 1. *See Sullivan*, 307 Pa. at 224, 160 A. at 853.

**6.** Other jurisdictions have reached similar holdings. *See, e.g., City of Madison v. Wade*, 88 Ga. 699, 16 S.E. 21 (Ga.1892) (holding that

preceded the advent of voter registries; such registries were put in place, through legislation, to provide *prima facie* evidence that the voter retained such qualifications. *See In re Contested Election of McDonough*, 105 Pa. 488 (1884). The aim was apparently to avoid subjecting verification of voter qualifications to the pressure of election day, *see generally State v. Butts*, 31 Kan. 537, 2 P. 618, 619 (Kan.1884), and to provide a check on duplicate voting, *see generally Eastwood v. Donovan*, 259 Minn. 43, 105 N.W.2d 686, 688 (Minn.1960).[7]

registration adds no qualifications to voters, but only serves to identify them as persons qualified to vote); *Wilson v. Bartlett*, 7 Idaho 271, 62 P. 416, 417 (Idaho 1900) (finding that registration is not a substantive qualification of an elector); *People v. Hoffman*, 116 Ill. 587, 5 N.E. 596, 608 (Ill.1886) (noting that the state constitution recites the qualifications for voters, whereas the registry statute is merely a means of ascertaining whether an individual possesses such qualifications); *Cave v. Conrad*, 216 Ind. 304, 24 N.E.2d 1010, 1011 (Ind.1940); *Piuser v. Sioux City*, 220 Iowa 308, 262 N.W. 551, 554 (Iowa 1935) ("We think it is generally recognized that ... registration is a regulation of the exercise of the right of suffrage and not a qualification for such right." (citation and internal quotation marks omitted)); *State v. Butts*, 31 Kan. 537, 2 P. 618, 621 (Kan.1884); *Eastwood v. Donovan*, 259 Minn. 43, 105 N.W.2d 686, 688 (Minn.1960) ("Registration does not affect the qualification of a citizen to vote but is simply a legislative requirement enacted to further the orderly conduct of an election ... If the legislature had intended to make registration a necessary qualification for signing a nominating petition, it could easily have said so."); *State v. Weaver*, 122 Tenn. 198, 122 S.W. 465, 465 (Tenn.1909) ("The registration laws of the state do not prescribe qualifications of electors, but were enacted for the purpose of regulating the exercise of the elective franchise...."); *State ex rel. Keefe v. McInerney*, 63 Wyo. 280, 182 P.2d 28, 31 (Wyo.1947) (observing that most courts "take the view that it is not necessary that a petition similar to that involved in this case be signed by people who are registered, and that it is sufficient if it is signed by people otherwise qualified as electors"). *But see Hunt v. Superior Court*, 64 Ariz. 325, 170 P.2d 293, 295 (Ariz.1946).

7. The court in *Butts*, per then-Judge Brewer (later Justice Brewer of the United States Supreme Court), adds the following historical information concerning the manner in which qualifications were ascertained prior to the advent of registries:

[T]he uniform practice was to keep a list of those who voted. It was also the privilege of every citizen to challenge the vote of any one offering to vote whose right to vote he suspected, and the party challenged was called upon to prove, by his own oath or otherwise, his possession of the qualifications of an elector. So that when the framers of the constitution introduced [Article V, Section 4 of the Kansas Constitution,] something more was intended than the mere preservation of a poll-list on the day of election and the ascertaining

These specific concerns are absent, however, relative to individuals who sign nominating petitions well in advance of election day. In the latter context, a significant governmental objective is to provide a reasonable means by which prospective candidates unconnected with the major parties may have an influence on the democratic process, while at the same time ensuring that only persons satisfying the requisite age, citizenship, and residency requirements participate in placing such a candidate on the ballot. This interest is sufficiently served by requiring signers and circulators of nominating papers to be qualified electors, even if they are not registered to vote. Notably, as well, and in contrast, for major political parties both the signer and the affiant must be registered and enrolled electors of the political party designated in the petition, in addition to having qualified elector status, *see* 25 P.S. §§ 2868, 2869; the prerequisite that the individual be registered as a party member in this context prevents those outside the party from interfering in intra-party affairs. Section 951 of the Election Code, however, pertaining to independent political bodies, contains no analog to this requirement, thus also supporting the position that the requirement simply does not exist for signers and affiants relative to nomination papers for an independent political body.[8]

of the qualification of the voters by challenges on that day. Obviously, what was contemplated was the ascertaining beforehand by proper proof of the persons who should, on the day of election, be entitled to vote. . . . Requiring a party to be registered is not in any true sense imposing an additional qualification any more than requiring a voter to go to a specific place for the purpose of voting, or requiring him to prove, by his own oath or the oaths of other parties, his right to vote when challenged, or than requiring a naturalized foreigner to present his naturalization papers. Each and all of these are simply matters of proof—steps to be taken in order to ascertain who [are] and who are not entitled to vote.

*Butts*, 2 P. at 621.

8. Certainly a state has a legitimate interest in confining third party candidacies, within constitutional limitations, so as not to permit them to unduly distort or skew the election process. *See, e.g., Anderson v. Celebrezze,* 460 U.S. 780, 788 n. 9, 103 S.Ct. 1564, 1570 n. 9, 75 L.Ed.2d 547 (1983) ("The state has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates."); *Storer v.*

The recently-enacted Voter Registration Law,[9] which governs voter registration and voting procedure, also confirms this view. That statute separately defines the terms "qualified elector" and "registered elector"; specifically, it defines a "registered elector" as a "qualified elector who is registered to vote." 25 Pa.C.S. § 1102. Likewise, Section 1107 of the Voter Registration Law specifies that all electors who are registered to vote on the law's effective date, and who remain "qualified," shall continue to be registered. *See* 25 Pa.C.S. § 1107. This provision would make little sense if the Legislature understood the term "qualified" to include a requirement of being registered.[10]

Because this Court has never expressly interpreted the phrase "qualified elector" for purposes of Section 951 of the Election Code, the Commonwealth Court relied for its disposition on this issue upon a 1939 case in which this Court construed the term "elector," as used in the Liquor Control Act and the Beverage Licensing Law, to signify a registered voter. *See* Commonwealth Court Memorandum Opinion of September 27, 2004, at 4 (citing *Aukamp v. Diehm,* 336 Pa. 118, 121, 8 A.2d 400, 401 (Pa.1939)). Objectors presently agree with the Commonwealth Court's analysis in this regard, and argue that principles of *stare decisis* dictate that this Court is not at liberty to construe the term "qualified elector" as used in Section 951 of the Election Code in any other

*Brown,* 415 U.S. 724, 736, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974) (noting that the Founders believed "that splintered parties and unrestrained factionalism may do significant damage to the fabric of government"). The question presented here, however, relates to the correct interpretation of the method that the Pennsylvania Legislature has chosen to regulate the election process, and not the availability of more restrictive measures, consistent with constitutional precepts.

9. Act of January 31, 2002, P.L. 18, No. 3, § 1 (as amended, 25 Pa.C.S. §§ 1101–3302).

10. The distinction between a "qualified elector" and a "registered elector" has been recognized by at least one federal court in Pennsylvania. *See Morrill v. Weaver,* 224 F.Supp.2d 882, 896–97 & n. 16 (E.D.Pa.2002) (predicting that this Court will construe the term "qualified elector" as used in Section 951 to exclude a registration requirement, and finding that inclusion of such a requirement as to petition circulators would render the statute unconstitutional).

fashion. As the *Aukamp* decision interpreted liquor and beverage regulations, however, whereas *Sullivan* pertained to the legislation governing ballot access for prospective candidates, *Sullivan* represents the more relevant precedent here. Notably, *Aukamp* does not cite or overrule *Sullivan*, or demonstrate any defect in that decision's rationale.

Nevertheless, I do acknowledge that, as concerns their substance, the two decisions are in tension. The reason is that, in reaching its conclusion, *Aukamp* cited to the same constitutional provision as *Sullivan*—namely, Section 1 of Article VIII of the Constitution of 1874—and directly contradicted *Sullivan's* interpretation of that provision by stating that the laws regarding voter registration modify an elector's constitutional "qualification" to vote. *See id.* As between the two decisions, however, *Sullivan* is, in my view, the better reasoned. In particular, the *Sullivan* Court closely analyzed the constitutional text, including its grammatical structure, and supported its position by drawing an apt analogy to the practice of law, as quoted above. *Aukamp's* analysis, by contrast, is superficial, as it merely states in a conclusory manner that the Constitution "prescribes as a qualification" that the elector must be registered, and opines that any other interpretation might result in a referendum for the grant of a liquor license on the demand of persons not qualified to vote.[11] In such circumstances, and particularly as *Sullivan* is much

11. The objectors forward a similar argument, contending that an interpretation of "qualified elector" which does not presuppose status as a registered voter would make it difficult for them to carry their burden of proving signature invalidity. The candidates disagree, and list other public databases besides voter registration rolls (e.g., driver's license and tax records) through which they claim it would be possible to determine qualified elector status. In this regard, I would simply observe that it is not the courts' function to facilitate objections to ballot access; rather, we are charged with fairly implementing legislative intent according to the framework chosen by the Legislature. In my view, the hurdles to objections arising from the General Assembly's having chosen qualified elector status as opposed to registration as the litmus for nomination papers for independent political bodies are simply consequent to the legislative design and attendant policy choices.

closer in context to the present scenario, it is my position, again, that it should have been followed here.[12]

At this juncture, I note that the Commonwealth Court attempted to address the concerns raised here (as well as in my prior concurring and dissenting statement) in conjunction with its most recent order precluding ballot access. In this regard, the Commonwealth Court suggested that, even if the registration standard had not been interposed, only 1,470 of the signatures presented by the candidates would need to be re-validated. *See In re Nomination Paper of Nader,* 568 M.D. 2004, 865 A.2d 8, 2004 WL 2339814 (Pa.Cmwlth. Oct. 13, 2004) (consolidated findings, opinion, and order), at 73. For reasons that are unclear from its opinion, however, the Commonwealth Court counted only the 1,470 signatures stricken because the signer had registered to vote after signing the petition, but failed to include a separate grouping of 7,506 signatures which were invalidated solely due to the lack of registration. Since the signatures in this latter category also were not stricken for any reason independent of non-registration, *see id.* at 43–73, it is evident that they would also have to be counted to assess the sufficiency of the nomination papers in the absence of a registration standard. Accordingly, and because the candidates' deficiency was less than 7,000 signatures under the Commonwealth Court's reasoning (as 18,818 signatures had been expressly found valid), the elimination of the registration standard would plainly result in a number greater than the 25,697 needed for ballot access.[13]

12. It is also worth observing that the Voter Registration Law—which, as noted, makes an express distinction between a qualified elector and a registered elector—did not exist when *Aukamp* was decided. That law specifies that nothing in the Election Code may be deemed inconsistent with it. *See* 25 Pa.C.S. § 1106(c). An interpretation of the Election Code under which the term "qualified elector" means "registered elector" would arguably be inconsistent with the Voter Registration Law, and thereby contravene legislative intent.

13. In the consolidated findings, opinion and order, the Commonwealth Court also indicated that the signatures under review were primarily the result of widespread, systemic fraudulent conduct on the part the individuals gathering them. *See id.* at 73–92 (stating that "this signature gathering process was the most deceitful and fraudulent exercise ever perpetrated upon this Court"). A review of the tables and exhibits

Finally, and as previously noted, I acknowledge that the question of waiver is of substantial concern in this case, as the candidates did not present their challenge to the registration standard in response to threshold efforts on the part of the Commonwealth Court to solicit omnibus pre-hearing evidentiary objections. Further, I recognize that at least one of the candidates' arguments made in the pre-hearing setting appears to have assumed the validity of a registration standard. Indeed, the candidates' latter argument gave rise to a statement by a majority of this Court in its September 29, 2004, opinion to the effect that registration was indeed a prerequisite to qualified elector status. *See Nader*, 580 Pa. at 47–50, 858 A.2d at 1182–83.[14]

While in such circumstances, the position that the candidates waived the legal argument against a registration requirement carries substantial weight, there are several competing considerations. First, candidates for political bodies bear a representative relationship to the body of qualified electors that nominate them; indeed, here, several individual signers who anticipated that their signatures would be stricken sought to intervene in the process and raise the same argument pertaining to the correct construction of the term "qualified elector." In such circumstances, strict application

attached to the order, however, suggest that the problem was of a more limited scale (for example, 687 signatures out of 51,273 reviewed—or approximately 1.3% of the signatures—were rejected on the basis of having been forged). Moreover, the Commonwealth Court cited no evidence that the candidates were specifically aware of fraud or misrepresentation at the time of their submissions, and the candidates note— and the objectors do not dispute—that when they became aware of any fraudulent conduct connected with specific signatures, they voluntarily withdrew those signatures from consideration. Finally, the Commonwealth Court's disposition is expressly predicated on a tallying of signatures as to which the objectors were unable to meet their burden of proof (*i.e.*, valid signatures), which is also the subject of my assessment here.

**14.** I do not regard this statement on the part of a majority of this Court as controlling here, because the Commonwealth Court's registration standard was not squarely before the Court at that juncture, and therefore, the statement represents *dictum*. Moreover, there was no express consideration of the statutory and constitutional text, nor the relevant authorities in connection with the statement.

of waiver principles, particularly as concerns implementation of the controlling law guiding resolution of an election controversy, would seem to me to be unduly harsh and in tension with legislative policies favoring ballot access. In the latter regard, by virtue of their timely filing and appropriate certifications, the candidates enjoyed the benefit of having presumptively valid nomination papers, subject only to challenges by objectors who bore the burden of proof with respect to invalidity. It is therefore troubling to me that such presumption should be disturbed, and disenfranchisement should occur, on grounds other than a definitive determination that controlling law was properly applied in reviewing the objections, particularly when a challenge to the legal standard in question was in fact raised by the time that the signature review process had commenced and was capable of being addressed on the merits by the Commonwealth Court within a short time thereafter.[15] In this regard, I would note that the origins of the doctrine of waiver are rooted in prudential concerns, and it is questionable whether that doctrine is appropriately applied to support the application of a signature review standard at odds with legislative intent.

In summary, I agree with the candidates that the term "qualified elector," for purposes of Section 951 of the Election Code, does not subsume a voter registration requirement, and that the candidates therefore retained at least 25,697 signatures that have not been stricken by the Commonwealth Court on appropriate grounds. Accordingly, I would have vacated the present order of the Commonwealth Court, thus restoring the candidates to their position on the ballot in accordance with the presumption of validity that controls in the absence of a deficiency in the candidates' nomination papers determined according to a correct application of the prevailing statutory criteria.

15. The candidates presented their challenge to the registration standard to the Commonwealth Court on September 27, 2004, and the Commonwealth Court addressed it on waiver grounds and also on the merits via *per curiam* opinion dated September 29, 2004.