BOLIN, Justice
(concurring specially).
I concur with this Court’s no-opinion affirmance of this case. However, I write specially because I respectfully disagree with Chief Justice Moore’s dissent to the extent that it concludes that the Secretary of State presently has an affirmative duty to investigate the qualifications of a candidate for President of the United States of America before printing that candidate’s name on the general-election ballot in this State. I fully agree with the desired result; however, I do not agree that Alabama presently has a defined means to obtain it.[2]
Initially, Chief Justice Moore addresses certain threshold issues, including the timeliness of the plaintiffs’ challenge to presidential-ballot access for the general election in 2012. Here, the Secretary of State asserted the affirmative defense of laches, arguing that the plaintiffs had im- *1046 permissibly delayed in asserting their challenge to President Obama’s ballot access. See Rule 8, Ala. R. Civ. P. “ ‘ “To establish the application of the doctrine of laches, [a defendant] ha[s] to show that [the plaintiff] delayed in asserting his right or claim, that his delay was inexcusable, and that his delay caused the [defendant] undue prejudice.” ’ ” Ex parte Lightwave Techs., L.L.C., 971 So.2d 712, 720 (Ala.2007) (quoting Ex parte Grubbs, 542 So.2d 927, 929 (Ala.1989)).
Chief Justice Moore concludes in his special writing that the plaintiffs’ challenge, brought 5 weeks after Barack Obama was selected as the Democratic Party nominee for President of the United States and only 26 days before the general election, did not constitute “inexcusable delay.” As to the merits of this proceeding, I cannot agree that there was not inexcusable delay and undue prejudice amounting to laches. “ ‘Objections relating to nominations must be timely made. It is too late to make them after the nominee’s name has been placed on the ballot and he has been elected to office....’” State ex rel. Norrell v". Key, 276 Ala. 524, 525-26, 165 So.2d 76, 77 (1964) (quoting 29 C.J.S. Elections § 141 (emphasis added)). The evidence suggests that the Secretary of State had expressed to the plaintiffs and their representatives well prior to the primary and as early as February 2, 2012, that she[3] had no duty to investigate the eligibility qualifications of a presidential candidate. Barack Obama was nominated as his party’s presidential candidate at the Democratic National Convention on September 5, 2012.. For this election, ballots were required to be printed and delivered to the absentee-election manager of each county by at least September 27, 2012. See § 17-11-12, Ala.Code 1975. The plaintiffs did not file their petition challenging Barack Obama’s ballot access until October 11, 2012, approximately eight months after being apprised of the Secretary of State’s position that she had no affirmative duty to investigate and two weeks after the ballots were to be printed and delivered to the various counties. The failure by the plaintiffs to at least file their petition challenging ballot access during the intervening time between Barack Obama’s nomination as his party’s presidential candidate and the time in which the ballots were due to be printed and delivered to the various counties constitutes, I believe, “inexcusable delay” on the part of the plaintiffs. The prejudice that would have ensued from such a late challenge, if successful, would have been twofold: first, assuming it could have been accomplished from a practical standpoint, the reprinting and distribution of general-election ballots would have come, at that late date, at great financial cost to the State; and second, and just as important, the reprinted ballots would differ from absentee ballots already sent to the members of our military and other citizens overseas. This would not be a proper way to conduct such an important election.
Moving beyond the merits of the matter before us, and with due regard to the vital importance to the citizenry of the State of Alabama that the names of only properly qualified candidates appear on a presidential-election ballot for election to the highest office in our country, I write specially to note the absence of a statutory framework that imposes ' an affirmative duty upon the Secretary of State to investigate claims such as the one asserted here, as well as a procedure to adjudicate those claims. The right of a lawful and proper potential candidate for President to have ballot access must be tempered and bal *1047 anced against a clear process for removal of an unqualified candidate. Nothing in this process should be left to guesswork, or, with all proper respect, to unwritten policies of the Secretary of State, and certainly not without a disqualified candidate having a clear avenue for judicial review consistent with the time constraints involved and due-process considerations.
As noted above, Chief Justice Moore concludes in his special writing that the Secretary of State has an affirmative duty to investigate the qualifications of a candidate for President of the United States of America before printing that candidate’s name on the general-election ballot in this State. Although logically the Secretary of State, being the chief elections official of the state, should be vested with such a duty, under our present constitutional and statutory framework addressing elections, including presidential elections, not only is that not the case, but the Secretary of State would be bereft of written authority for such an action and ill equipped from a practical standpoint to carry out such an important duty.
The Office of Secretary of State is a constitutional office whose general duties are prescribed in Ala. Const.1901, Art. I, § 134, as follows:
“The secretary of state shall be the custodian of the great seal of the state, and shall authenticate therewith all official acts of the governor, except his approval of laws, resolutions, appointments to office, and administrative orders. He shall keep a register of the official acts of the governor, and when necessary, shall attest them, and lay copies of same together with copies of all papers relative thereto, before either house of the legislature, when required to do so, and shall perform other duties as may be prescribed by law.”
The general duties and scope of the Secretary of State’s office are codified in § 36-14-1 et seq., Ala.Code 1975. Section 17-1-3, Ala.Code 1975, provides that the Secretary of State is the chief elections official in the State and, as such, shall provide uniform “guidance” for election activities. It is, however, a nonjudidal office without subpoena power or investigative authority or the personnel necessary to undertake a duty to investigate a nonresident candidate’s qualifications, even if such a duty could properly be implied.
Section 17-9-3, Ala.Code 1975, provides:
“(a) The following persons shall be entitled to have their names printed on the appropriate ballot for the general election, provided they are otherwise qualified for the office they seek:
“(1) All candidates who have been put in nomination by primary election and certified in writing by the chair and secretary of the canvassing board .of the party holding the primary and filed with the judge of probate of the county, in the case of a candidate for county office, and the Secretary of State in all other cases, on the day next following the last day for contesting the primary election for that office if no contest is filed....
“(2) All candidates who have been put in nomination by any caucus, convention, mass meeting, or other assembly of any political party or faction and certified in writing by the chair and secretary of the nominating caucus, convention, mass meeting, or assembly and filed with the judge of probate, in the case of a candidate for county office, and the Secretary of State in all other cases....
“(3) Each candidate who has been requested to be an independent candidate for a specified office by written petition signed by electors qualified to vote in the election to fill the office when the petition has been filed with *1048 the judge of probate, in the case of a county office and with the Secretary of State in all other cases....
“(b) The Secretary of State, not later than 45 days after the second primary, shall certify to the judge of probate of each county in the state, in the case of an officer to be voted for by the electors of the whole state, and to the judges of probate of the counties composing the circuit or district in the case of an officer to be voted for by the electors of a circuit or district, upon suitable blanks to be prepared by him or her for that purpose, the fact of nomination or independent candidacy of each nominee or independent candidate or candidate of a party who did not receive more than 20 percent of the entire vote cast in the last general election preceding the primary who has qualified to appear on the general election ballot....”
“The provisions of Section 17-9-3 ... shall apply to presidential preference primaries held under the provisions of this article unless clearly inconsistent herewith or inappropriate for the conduct of a presidential preference primary.” § 17-13-101, Ala. Code 1975. Section 17-14-31(a), Ala.Code 1975, provides:
“(a) When presidential electors are to be chosen, the Secretary of State of Alabama shall certify to the judges of probate of the several counties the names of all candidates for President and Vice President who are nominated by any national convention or other like assembly of any political party or by written petition signed by at least 5,000 qualified voters of this state.”
These sections, when read together, require only that the Secretary of State certify and include on the general-election ballot those presidential candidates who have been nominated by their respective parties following that party’s national convention and who are otherwise qualified to hold the office of President. However, nothing in the express wording of these statutory provisions imposes upon the Secretary of State the duty to affirmatively investigate the qualifications of a presidential candidate. Consistent with this conclusion is Op. Att’y Gen. No. 1998-00200 (August 12,1998), which states:
“The Secretary of State does not have an obligation to evaluate all of the qualifications of the nominees of the political parties and independent candidates for state offices prior to certifying such nominees and candidates to the probate judges pursuant to [§ 17-9-3, Ala.Code 1975]. If the Secretary of State has knowledge gained from an official source arising from the performance of duties prescribed by law, that a candidate has not met a certifying qualification, the Secretary of State should not certify the candidate.”
(Emphasis added.)
Rather, the Secretary of State contends that the task of ensuring a candidate’s qualifications is left to the leadership of that candidate’s respective political party, a less than ideal procedure for all challengers because of its partisan nature. See generally Knight v. Gray, 420 So.2d 247 (Ala.1982) (holding that the Democratic Party had the authority to hear pre-pri-mary challenges to the political or legal qualifications of its candidates).
Courts in other states have tended to agree that the investigation of eligibility requirements of a particular candidate is best left to the candidate’s political party. In Keyes v. Bowen, 189 Cal.App.4th 647, 117 Cal.Rptr.3d 207 (2010), the plaintiffs brought an action against California’s Secretary of State and others, alleging that there was reasonable doubt that President Obama was a natural-born citizen, as is required to become President of the United States (U.S. Const., Art. II, § 1) and *1049 that the Secretary of State had a ministerial duty to verify that President Obama met the constitutional qualifications for office before certifying him for inclusion on the ballot. The trial court entered a judgment against the plaintiffs, concluding that the Secretary of State was required to see that state election laws were enforced, but that the plaintiffs had failed to identify a state election law imposing a duty upon the Secretary of State to demand documentary proof of birthplace from presidential candidates. Id. The plaintiffs appealed.
Like Alabama’s Secretary of State, the California Secretary of State is the chief elections official of that state and is charged with ensuring “ ‘that elections are efficiently conducted and that state election laws are enforced.’ ” 189 Cal.App.4th at 658, 117 Cal.Rptr.3d at 214 (quoting California Gov’t Code, § 12172.5). Also similar to § 17-14-31(a) is California Election Code § 6901, which governs general elections and states:
“ ‘Whenever a political party, in accordance with Section 7100, 7300, 7578, or 7843 [none of which concern constitutional eligibility], submits to the Secretary of State its certified list of nominees for electors of President and Vice President of the United States, the Secretary of State shall notify each candidate for elector of his or her nomination by the party. The Secretary of State shall cause the names of the candidates for President and Vice President of the several political parties to be placed upon the ballot for the ensuing general election.’ ”
189 Cal.App.4th at 659, 117 Cal.Rptr.3d at 214 (emphasis omitted). In concluding that the California statutes did not impose a duty on the Secretary of State to determine whether a presidential candidate meets the eligibility criteria of the United States Constitution, the appellate court stated:
“[T]he truly absurd result would be to require each state’s election official to investigate and determine whether the proffered candidate met eligibility criteria of the United States Constitution, giving each the power to override a party’s selection of a presidential candidate. The presidential nominating process is not subject to each of the 50 states’ election officials independently deciding whether a presidential nominee is qualified, as this could lead to chaotic results. Were the courts of 50 states at liberty to issue injunctions restricting certification of duly-elected presidential electors, the result could be conflicting rulings and delayed transition of power in derogation of statutory and constitutional deadlines. Any investigation of eligibility is best left to each party, which presumably will conduct the appropriate background check or risk that its nominee’s election will be derailed by an objection in Congress, which is authorized to entertain and resolve the validity of objections following the submission of the electoral votes. (3 U.S.C. § 15.).”
Keyes, 189 Cal.App.4th at 660, 117 Cal. Rptr.3d at 215-16.
Chief Justice Moore would impose upon the Secretary of State a duty to investigate the qualifications of all presidential candidates. However, Chief Justice Moore has failed to demonstrate how the Secretary of State, a nonjudicial officer with no subpoena power or investigative authority, could carry out this duty in those cases where an actual dispute arises regarding a candidate’s qualifications, or, as in this case, could demand delivery to her of a certified copy of a candidate’s birth certificate from the official-records depository in another state in which the birth certificate is kept. Chief Justice Moore has cited cases in which federal district courts have upheld decisions of state officials, including secretaries of state, who had refused to qualify *1050 proposed candidates who were less than 35 years old. See Socialist Workers Party of Illinois v. Ogilvie, 357 F.Supp. 109 (N.D.I11.1972), and Peace & Freedom Party v. Bowen, 912 F.Supp.2d 905 (E.D.Cal. 2012). However, in each of those cases there was no real dispute as to the candidates’ qualifications, because both candidates conceded they did not satisfy the age requirement of Art. II, § 1, U.S. Const. Therefore, there was no need for the secretary of state to affirmatively investigate the matter of the candidates’ qualifications.
The plaintiffs in this case did not necessarily challenge whether President Obama met the “natural-born citizen” requirement of Art. II, § 1, cl. 4 of the United States Constitution. Rather, the plaintiffs sought a writ of mandamus ordering the Secretary of State to authenticate the eligibility of each presidential candidate by requiring the candidates to produce a certified copy of his birth certificate. Although this requested relief, as stated above but worthy of repetition, may be highly desirable, I conclude that the Secretary of State had neither the duty nor the authority to compel a presidential candidate to produce a certified copy of a birth certificate or independently to obtain by other lawful means such a certified copy; therefore, the question remains as to what recourse a party with standing has to challenge the qualifications of a presidential candidate.
As a former probate judge[4] in this State, I am well aware of the void created in Alabama election law by the fact that the office of Secretary of State is without authorization, and concomitantly without the tools and enforcement power necessary thereto, to undertake the necessary and desirable burden of affirmatively investigating a presidential candidate’s qualifications. The citizens of the State of Alabama are always entitled to have the names of only qualified candidates appear on their election ballot, most particularly when voting for the President of the United States. Looking forward, I would respectfully call upon the legislature to provide legislation that imposes this duty upon the Secretary of State and to give that office the authority and tools necessary to compel the compliance by a candidate, and that candidate’s party, upon penalty of disqualification. The office of President is the only elective office that does not require a state residency to be a candidate, which makes the authority to obtain foreign records or documents a vital investigative tool. Under our current structure, however, the burden of investigating a presidential candidate’s qualifications is best left — unfortunately or not — to that candidate’s particular party, which as aptly stated in Keyes, supra, is “presumed” to conduct a thorough investigation of the candidate’s qualifications or risk a challenge to that candidate’s candidacy in Congress, the appropriate forum for a post-election challenge to a President’s qualifications. See 3 U.S.C. § 15. However, it should not be necessary to rely on a post-election Congressional remedy if it can be proven before the election that the candidate is not qualified. The Secretary of State should have the written mandate to determine requisite qualifications, and a disqualified candidate should have a defined path of expedited judicial review.
Adding further to the need for a state statutory means of determining the qualifications of presidential candidates is the lack of a pre-election remedy in the federal courts resulting from the potential of the political-question doctrine to divest a federal court of jurisdiction to hear a challenge to a presidential candidate’s qualifications and the difficulty a party seeking to challenge a presidential candidate’s *1051 qualifications in federal court would have in establishing standing under Article III of the United States Constitution. The Court in Keyes, supra, explained:
“Indeed, in a case very similar to this one, the United States District Court for the Northern District of California dismissed a challenge to John McCain’s citizenship, holding that presidential qualification issues are best resolved in Congress. {Robinson v. Bowen (N.D.Cal.2008) 567 F.Supp.2d 1144, 1147.)
“The federal court noted that Title 8 United States Code section 15 sets forth a process for objecting to the President elect, and the Twentieth Amendment provides that, ‘if the President-elect shall have failed to qualify, then the Vice President-elect shall act as President until a President shall have qualified; and the Congress may by law provide for the case wherein neither a President-elect nor a Vice President-elect shall have qualified, declaring who shall then act as President, or the manner in which one' who is to act shall be elected, and such person shall act accordingly until a President or Vice President shall have qualified.’ Thus, ‘mechanisms exist under the Twelfth Amendment and 3 U.S.C. § 15 for any challenge to any candidate to be ventilated when electoral votes are counted, and that the Twentieth Amendment provides guidance regarding how to proceed if a president elect shall have failed to qualify. Issues regarding qualifications for president are quintessentially suited to the foregoing process. Arguments concerning qualifications or lack thereof can be laid before the voting public before the election and, once the election is over, can be raised as objections as the electoral votes are counted in Congress. The members of the Senate and the House of Representatives are well qualified to adjudicate any objections to ballots for allegedly unqualified candidates. Therefore, this order holds that the challenge presented by plaintiff is committed under the Constitution to the electors and the legislative branch, at least in the first instance. Judicial review — if any— should occur only after the electoral and Congressional processes have run their course.’ (Robinson v. Bowen, supra, 567 F.Supp.2d at p. 1147.)”
Keyes, 189 Cal.App.4th at 661, 117 Cal. Rptr.3d at 216. Thus, I do agree with Chief Justice Moore that the political-question doctrine would likely divest a federal court of jurisdiction to hear a challenge to a presidential candidate’s qualifications. It is also very unlikely that a party seeking to challenge a presidential candidate’s qualifications in federal court would be able to establish standing under Article III. See Daniel P. Tokaji, Commentary, The Justiciability of Eligibility: May Courts Decide Who Can Be President?, 107 Mich. L.Rev. First Impressions 31 (2008), and the cases cited therein.
As called for above, the only real alternative to a judicial challenge to the eligibility, or the disqualification, of a presidential candidate in federal court is a pre-election challenge to the candidate’s qualifications or disqualification brought in state court pursuant to state laws. Professor Tokaji has explained:
“Although the possibility for state-court litigation of a presidential candidate’s eligibility may seem counterintui-tive, there is a good reason for believing that this sort of dispute belongs in state court. Article II, Section 1 of the Constitution provides: ‘Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress.’ In litigation surrounding the 2000 election, Bush’s legal team argued that the Florida Supreme Court violated *1052 this provision by failing to follow the Florida legislature’s instructions on post-election proceedings. Chief Justice Rehnquist’s concurring opinion in Bush v. Gore [, 531 U.S. 98 (2000),] accepted this argument, concluding that the state supreme court’s construction of certain provisions of state election law went beyond the bounds of proper statutory interpretation. Yet none of the Justices disputed that state courts may hear cases alleging violations of state election statutes or that state courts generally possess the power to interpret and enforce those laws.
“State-court litigation might proceed as a lawsuit seeking to keep a presidential candidate off the primary or general election ballot, on the ground that he or she does not satisfy the requisite qualifications. There exists some recent precedent for this type of case. In 2004, supporters of presidential candidate John Kerry brought a number of state-court actions seeking to deny Ralph Nader access to state ballots. In In re Nomination Papers of Nader [, 580 Pa. 134, 860 A.2d 1 (2004)], for example, registered voters in Pennsylvania filed suit in state court, seeking to have the names of independent candidate Nader and his running mate Peter Camejo excluded from the ballot. As in several other states, the objectors challenged the petition signatures submitted by the Nader-Camejo campaign. In addition, the Pennsylvania objectors argued that Nader and Camejo were not qualified to appear on the general election ballot by virtue of the state’s ‘sore loser’ law, which prohibited candidates from running in a general election after running in state primaries. Although the Pennsylvania Supreme Court found that its statute did not in fact justify the exclusion of Nader and Camejo from the ballot, there was no doubt as to the state court’s ability to entertain a challenge to a presidential candidate’s qualifications in the course of determining whether to deny that candidate access to the state ballot.
“It is conceivable that a comparable state-court lawsuit could be filed, in Pennsylvania or another swing state, to challenge a presidential candidate’s constitutional qualifications to serve. There is no requirement that a plaintiff in a state-court lawsuit meet the Article III or prudential requirements for standing. FuHher, the federal political question doctrine does not bar state-couH ■ litigation seeking to exclude a presidential candidate from the ballot on the ground that he or she is ineligible. It is also conceivable that a state-court case challenging a presidential candidate’s eligibility could be brought after an election. State law might allow a post-election contest of primary or general election results on the ground that the candidate who gained the most votes does not meet the qualifications for office. A losing presidential candidate could bring a contest petition in state court, seeking an order invalidating the election results if state law allows such a remedy.
“There are obvious reasons why such post-election challenges would be undesirable. As Rick Hasen has argued in Beyond the Margin of Litigation, pre-election litigation is generally preferable to post-election litigation. It is generally better to resolve disputes before an election, allowing problems to be avoided in advance rather than putting courts in the difficult position of cleaning up the mess afterwards. This is particularly true in the context of a challenge to a presidential candidate’s qualifications. In the event that a candidate is deemed ineligible, the party could still put up a substitute.
“Of course, it is up to states — and, in particular, to state legislatures — to de *1053 fine the rights and remedies available in cases where a presidential candidate is alleged to be ineligible. There is certainly no constitutional requirement that the state provide either a pre-election remedy (such as denial of ballot access) or a post-election remedy (like an order invalidating election results) for such disputes. But there remains no constitutional bar to such state-law remedies. In fact, such remedies would seem to fall squarely within what Article II contemplates in leaving it to state legislatures to define the manner by which presidential electors are appointed.”
107 Mich. L.Rev. First Impressions at 37-38 (some emphasis added).
Even though I submit that a statutory procedure for addressing pre-election presidential-candidate-qualification resolution, while also imposing an affirmative duty upon the Secretary of State to investigate and pursue the necessary review, is the best vehicle to accomplish the desired result, an action brought in state court challenging a presidential candidate’s qualifications is not without potential problems. In that regard, Professor Tokaji has further noted:
“A downside of such lawsuits is that they could lead to mischief and inconsistency in the state courts. That is particularly true where members of one party or another dominate a state’s highest court. For example, a majority of Florida’s judges were appointed by Democratic Governor Lawton Chiles, and Ohio’s supreme court currently is dominated by elected Republican justices. Suppose that a group of Florida voters brought a state-court action seeking to exclude McCain’s name from that state’s ballot on the ground that he is ineligible to serve. Alternatively, suppose that Ohio voters brought a state lawsuit attempting to knock Obama off the Ohio ballot, alleging that he is ineligible. Suppose further that the state supreme court in either state actually grants the relief requested, excluding the challenged candidate from the ballot on the ground that he is not a natural born citizen. Notwithstanding Article II’s language conferring authority on state legislatures to appoint electors, the prospect of a renegade state court excluding a presidential candidate who is, in fact, qualified is enough to give one pause. It is also possible that state courts in different states could reach conflicting decisions on whether a challenged presidential candidate satisfies the eligibility requirements in Article II.
“Fortunately, there would be an avenue for federal judicial review of such cases. Because the state court’s decision would rest on federal law — in this case Article II’s specification of the requirements to serve as president — the U.S. Supreme Court could hear the case on a petition for writ of certiorari. This is true even if the original state-court action would not have been justiciable in federal court. In ASARCO v. Radish, [490 U.S. 605 (1989),] for example, the Court held that defendants who lost in state court could obtain U.S. Supreme Court review of federal issues decided against them, even though the original plaintiffs would not have had standing to bring the action in a federal court. The Court held that defendants had standing to seek Supreme Court review on the theory that they had suffered an ‘injury’ by virtue of the adverse state-court judgment against them. For similar reasons, if a candidate were removed from the Florida ballot as part of a state-court action, on the ground that he was constitutionally ineligible to serve as president, that candidate would presumably have standing to seek U.S. Supreme Court review — even if the original plaintiffs (the voters who sought to remove his name from the ballot) would *1054 not have had standing to sue in federal court as an initial matter. The prospect of U.S. Supreme Court review provides some assurance against a renegade state court rejecting a candidate who is eligible to be president, and against the possibility of two or more state courts reaching different conclusions on the same presidential candidate’s eligibility.”
107 Mich. L.Rev. First Impressions at 38-39.
The courts of this State are without jurisdiction to hear a post-election challenge to a presidential election. See § 17-16-44, Ala.Code 1975. Alabama law currently provides no express means by which a party with standing may make, outside political-party machinery, a pre-election challenge to a presidential candidate’s qualifications. The problem is further exacerbated by the compressed time period between a presidential nomination by a national-party-nominating convention and the date ballot preparation must be finished and absentee ballots delivered to counties in Alabama. As Professor Tokaji stated, a pre-election challenge to a presidential candidate’s qualifications in state court pursuant to state election laws may be the best, or perhaps the only, relief available to an aggrieved party with standing. I agree, and, accordingly, I would respectfully invite the Alabama Legislature to enact a statutory process that defines a pre-election course of conduct, consistent with due process for the candidate, that vests an investigative duty upon the Secretary of State, while providing rights and remedies available to a party with standing who seeks to challenge the qualifications of a candidate for the office of President of the United States of America.

. See Chief Justice Moore’s dissent for a statement of the facts and procedural history relevant to the issue presented.

. Although this case is now styled with Jim Bennett as the Secretary of State and the appellee, Beth Chapman was Secretary of State at all times relevant to this action.

. The probate judge is the chief elections official of a county. § 17-1-3, Ala.Code 1975.