RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0236p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────────

ROBERT F. KENNEDY, JR.,

　　　　　*Plaintiff-Appellant,*

*v.*

JOCELYN BENSON, in her official capacity as Michigan
Secretary of State,

　　　　　*Defendant-Appellee.*

┐
│
│
│  No. 24-1799
│
│
│
┘

────────────────

On Petition for Rehearing En Banc
United States District Court for the Eastern District of Michigan at Detroit.
No. 2:24-cv-12375—Denise Page Hood, District Judge.

Decided and Filed:  October 16, 2024

Before:  CLAY, McKEAGUE, and BLOOMEKATZ, Circuit Judges.

────────────────

## COUNSEL

**ON PETITION FOR REHEARING EN BANC:**  Brandon L. Debus, DICKINSON WRIGHT
PLLC, Troy, Michigan, for Appellant.  **ON RESPONSE:**  Heather S. Meingast, Erik A. Grill,
OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

　　　　The court delivered an order denying the petition for rehearing en banc.  CLAY, J. (pp.
3–10), delivered a separate opinion concurring in the denial of the petition for rehearing en
banc.  GRIFFIN, J. (pg. 11), also delivered a separate opinion concurring in the denial of the
petition for rehearing en banc, in which MATHIS, J., joined.  THAPAR (pp. 12–19) and
READLER (pp. 20–32), (app. 33–34), JJ., delivered separate opinions dissenting from the denial
of the petition for rehearing en banc.  McKEAGUE, J. (pp. 35–37), delivered a separate
statement respecting the denial of rehearing and the denial of rehearing en banc.

—————————

**ORDER**

—————————

The court received a petition for rehearing en banc. The original panel has reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision. The petition was then circulated to the full court.[*] Less than a majority of the judges voted in favor of rehearing en banc.

Therefore, the petition is denied.

—————————

[*]In accordance with 6 Cir. I.O.P. 35(b), Judge McKeague, a senior judge, did not participate in the en banc proceedings; he writes separately as a member of the original panel in this case. See 6 Cir. I.O.P. 35(d)(1)–(2). Judge Davis is recused from participation in this case.

————————————

**CONCURRENCE**

————————————

CLAY, Circuit Judge, concurring in the denial of rehearing en banc. Plaintiff Robert F. Kennedy, Jr. and our dissenting colleagues would have us believe that Plaintiff's First Amendment rights are being trampled upon by the decision of the Michigan Secretary of State to decline to remove Plaintiff's name from Michigan's presidential ballot—notwithstanding the fact that doing so at this late stage would disrupt the orderly conduct of the presidential election in Michigan. Plaintiff and our dissenting colleagues argue that requiring Plaintiff's name to remain on the ballot is violative of Plaintiff's First Amendment rights because doing so falsely conveys that Plaintiff wishes to put himself forward as a presidential candidate and wishes, if elected, to serve as President of the United States. The argument is completely fraudulent, and lacks any connection to the protection of Plaintiff's First Amendment rights. This is because, at the same time that Plaintiff claims he wants to be off the presidential ballot in Michigan because he is no longer a candidate for President, he is suing to have his name placed on the ballot as a presidential candidate in the state of New York based on his contention that he continues to wish to campaign for the Office of President. We cannot discern Plaintiff's personal and/or political motives for advancing completely contradictory arguments in different jurisdictions; however, the duplicitous nature of his arguments, which vary from state to state, have absolutely nothing to do with any desire on Plaintiff's part to protect the sanctity of his First Amendment rights. The dissents, unfortunately, rush to align themselves with Plaintiff's bogus claims.

Plaintiff seeks to remove his name from Michigan's presidential ballot less than one month before the date of the election, in which hundreds of thousands of Michiganders have already returned their absentee ballots. This is also his second attempt to remove himself from the ballot via the courts, inasmuch as Plaintiff filed this action only after losing in state court. Plaintiff's lawsuit therefore seeks to not only disrupt the functioning of Michigan's elections, but also garner another bite at the procedural apple. For the reasons that follow, I concur in the Court's denial of the rehearing of this case en banc.

## I. BACKGROUND

Plaintiff has been a candidate for President of the United States for much of the past two years.  He first ran as a candidate in the Democratic Party's primaries, and after failing to win the nomination, decided to run as a third-party presidential candidate for the Natural Law Party.  Plaintiff undertook a prolonged effort to gain ballot access in each of the nation's states, and he ultimately earned a place on the Michigan ballot after winning the Natural Law Party's presidential nomination on April 17, 2024.  *See* Rebecca Davis O'Brien, *Surprise Tactics and Legal Threats: Inside R.F.K. Jr.'s Ballot Access Fight*, N.Y. Times, Apr. 29, 2024.

Four months later, Plaintiff withdrew from the presidential race.  He sent two notices of withdrawal to the Michigan Bureau of Elections, first on August 23, 2024, and then on August 27, 2024.  Defendant, Michigan Secretary of State Jocelyn Benson, rejected each of these withdrawal notices, citing Mich. Comp. Laws §§ 168.686a(2), (4).  Plaintiff responded by filing suit on August 30, 2024, in the state Court of Claims.  In his state court complaint, Plaintiff alleged that by refusing to remove him from the ballot, Defendant violated various state election laws and the free speech protections of the Michigan Constitution.  The Court of Claims dismissed the complaint.  On September 4, 2024, Plaintiff appealed to the Michigan Court of Appeals.  Two days later, the Court of Appeals granted Plaintiff's appeal and remanded the case to the Court of Claims, which granted mandamus and ordered Defendant to remove Plaintiff's name from the ballot.  That same day, Defendant appealed to the Michigan Supreme Court, and on September 9, 2024, the court granted Defendant's appeal and affirmed the Court of Claims' order.

On September 6, 2024—in between the time of the Court of Appeals' and the Michigan Supreme Court's decisions—Defendant sent the certification of candidates to Michigan's county clerks.  Per the Court of Appeals' decision and subsequent order, Defendant's communication did not have Plaintiff's name listed as the candidate for the Natural Law Party, nor did it order that the ballots be printed.  Three days later, after the Michigan Supreme Court's decision was released, Defendant updated the names of candidates and included Plaintiff's name as the presidential candidate for the Natural Law Party.

After Plaintiff lost his case in state court, he filed suit in the U.S. District Court for the Eastern District of Michigan.   Plaintiff's district court complaint alleged three counts of constitutional violations: (1) a violation of Article II, Section 1, of the Constitution arguing "that states may not impose their stringent ballot access requirements on the national election for President" and that Defendant's placement of Plaintiff's name on the ballot serves "no other possible reason than to confuse unwitting Michigan voters to vote for a candidate no longer running for office," Compl., R. 1, Page ID #6–11; (2) a Fourteenth Amendment equal protection violation, arguing that the deadline by which a candidate withdraws gives an "advantage [to] the Democrats and Republicans" by unfairly preventing third-party candidates from withdrawing after receiving a party's nomination, *id.* at Page ID #11–15; and (3) a First Amendment compelled speech violation, arguing that by placing Plaintiff's name on the ballot, Defendant compels Plaintiff "to convey a false message to every citizen of Michigan that he is vying for their vote in this state," *id*. at Page ID #15–19.   Plaintiff subsequently filed a motion for a preliminary injunction, requesting that Defendant be ordered to remove his name from the ballot. The district court denied Plaintiff's motion, finding, *inter alia*, that his claims were barred by res judicata and failed on the merits.

## II.  DISCUSSION

The crux of Plaintiff's argument, and of Judge Readler's and Judge Thapar's dissents, is that Plaintiff's First Amendment protections have been violated by the Secretary of State. Plaintiff argues that he will be subject to reputational injury if he is left on the ballot, as voters will incorrectly believe that he is still a candidate for president.   He states that "once the ballots are printed" with his name on them, his supporters will "be left confused and angry for casting an invalid vote" for him.   Appellant's Br., ECF No. 6, 34.   Yet neither Plaintiff, nor the dissents, reconcile this argument with the fact that Plaintiff has fought to *keep* his name on the ballot in other states.   For example, Plaintiff recently filed suit in New York in which he demanded that the state add his name to the ballot.   *See Team Kennedy v. Berger*, No. 24A285, 2024 WL 4312515 (U.S. Sept. 27, 2024).

Plaintiff's attempts to put his name on the ballot in other states demonstrates that his First Amendment argument is completely fraudulent.   Plaintiff certainly does not believe that placing

his name on the New York ballot would leave his New York supporters "confused and angry for casting an invalid vote" for him. And yet, for reasons not elucidated, Plaintiff believes that Michigan is different—that somehow his supporters in Michigan will be angrier for casting a wasted vote than his New York supporters. Nowhere does Plaintiff reconcile these conflicting and contradictory positions, which undermine the very basis of his First Amendment claim.

Plaintiff's suit is also barred by res judicata. Under that principle, if a litigant's claims reach final judgment in one court, he cannot pursue the same causes of action in another; in other words, he cannot "get two bites at the apple." *Talismanic Props., LLC v. City of Tipp City*, 742 F. App'x 129, 131 (6th Cir. 2018). Michigan applies a broad interpretation of res judicata, such that a litigant cannot bring any "claim arising from the same transaction that the parties, exercising reasonable diligence, could have raised but did not." *Adair v. State*, 680 N.W.2d 386, 396 (Mich. 2004). Michigan's res judicata law "bars a second action on the same claim if (1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first." *Mecosta Cnty. Med. Ctr. v. Metro. Grp. Prop. & Cas. Ins. Co.*, 983 N.W.2d 401, 405 (Mich. 2022) (internal quotation marks and citation omitted).

Res judicata applies to each of Plaintiff's claims. Regarding the first element of Michigan's res judicata standard, the prior action was decided on the merits. The Court of Claims issued an opinion dismissing the state complaint on the merits, and the Michigan Supreme Court affirmed that dismissal. The second element is also met, as both Plaintiff and Defendant were parties to the state action. The primary issue, therefore, centers on the third res judicata element: whether the claims in the federal complaint were, or could have been, resolved in the state court case.

Plaintiff alleges three constitutional violations: (1) First Amendment compelled speech, (2) a violation of Article II, Section 1's prescriptions regarding the conduct of presidential elections, and (3) a Fourteenth Amendment equal protection claim regarding Michigan's purported disparate treatment of major and minor party candidates. Each of those claims could have been brought in state court. With respect to the First Amendment claim, Plaintiff's state court complaint listed a compelled speech claim under the Michigan Constitution, stating that

Defendant's actions compel "Plaintiff to convey a false message to every citizen of Michigan that he is vying for their vote in this state, when he is not." State Compl., R. 8-9, Page ID #188. Thus, Plaintiff evidently believed that Defendant's conduct implicated his speech interests prior to filing suit in state court, and he was therefore fully capable of raising a federal speech claim in the Court of Claims.

With respect to the Article II and equal protection claims, Plaintiff did not raise those causes of action in state court. But he could have. *See Adair*, 680 N.W.2d at 396. The claims in this case arise from the same transaction as the Court of Claims case: in both cases, Plaintiff alleged that Michigan unfairly placed his name on the ballot and he sought to have his name removed. The Article II count argues that the presence of Plaintiff's name on the ballot confuses Michigan voters and "waste[s] their votes," while the withdrawal deadlines are unreasonable and undermine the electoral process. Compl., R. 1, Page ID #6–11. Those precise arguments could have easily been made in state court; in fact, Plaintiff employs similar language in parts of his state court complaint, such as when he argues that votes for him are "wasted and in vain." State Compl., R. 8-9, Page ID #188. Regarding the equal protection count, Plaintiff argues that the state withdrawal deadlines unfairly benefit the major political parties, as minor party candidates are only permitted to withdraw prior to accepting a party's nomination. Yet before he filed in state court, Plaintiff knew Defendant rejected his request to withdraw from the ballot, implicating the exact same harms he raises here.

Judge Readler's dissent argues that res judicata does not apply because prior to September 9, 2024—the date on which Michigan listed Plaintiff as a candidate on the ballot— there was no Article II, equal protection, or First Amendment violation for Plaintiff to assert. Thus, the dissent argues, because Plaintiff filed his state complaint before September 9, 2024, he was unable to bring those constitutional claims in state court. But under this logic, constitutional causes of action are only ripe when ballots are finalized. That argument stands in contradiction of our precedent. *See Rosen v. Brown*, 970 F.2d 169, 173–74 (6th Cir. 1992) (addressing a challenge to the Ohio Secretary of State's decision, prior to ballots being finalized or printed, not to place a political party indicator next to a candidate's name on the ballot). Instead, Plaintiff was able to assert his claims in August of 2024, when Defendant declined to accept Plaintiff's

withdrawal notice.  It was at that point that Plaintiff became "threatened with 'imminent' injury in fact," as it was then that he became aware of Defendant's decision that his name should remain on the Michigan ballot.  *Carman v. Yellen*, 112 F.4th 386, 400 (6th Cir. 2024) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007)).  Plaintiff, who filed his state complaint after Defendant's denial of his request to be removed from the ballot, thus had ample opportunity to make his constitutional claims in state court.

At bottom, Plaintiff's current lawsuit is a re-run of his first.  When Plaintiff filed his state court lawsuit in August of 2024, he sought to challenge the Defendant's decision—based on Defendant's interpretation of Michigan election law—that he should remain listed as a candidate on Michigan's ballot.  In this lawsuit, Plaintiff continues to seek to have his name removed from the ballot.  The fact that Plaintiff has now identified new legal theories does not somehow allow Plaintiff a second bite at the apple.

Plaintiff's complaint also suffers from flaws on the merits.  Plaintiff's theory of injury, for example, argues that that "once the ballots are printed" with his name on them, he will inevitably suffer an "injury to reputation," and his supporters will "be left confused and angry for casting an invalid vote" for him.  Appellant's Br., ECF No. 6, 34.  But Plaintiff has not shown that removing his name would prevent a loss of face; in fact, Plaintiff requested in another case that New York courts *keep* him on the ballot.  *See Team Kennedy v. Berger*, No. 24A285, 2024 WL 4312515 (U.S. Sept. 27, 2024).  Plaintiff has never explained or reconciled these conflicting and contradictory positions.  Additionally, removing Plaintiff from the ballot at this late stage would have important consequences for the Natural Law Party.  The Chair of the Natural Law Party has explained that removing Plaintiff from the ballot would leave the party in a "bad position," as it could impact the party's ability to put candidates forward in the future.  *See* R. 8-5, Page ID #13.  Plaintiff seems completely oblivious to the fact, and selfishly unconcerned, that his actions in seeking to remove his name from the ballot at this late stage is likely to injure the fortunes of the Natural Law Party—which made him its presidential nominee and devoted the party's political capital and resources to promoting Plaintiff's political ambitions.

Both Judge Readler's and Judge Thapar's dissents argue that Plaintiff's First Amendment claim is both cognizable and implicates highly important election law issues.  Plaintiff is correct

that First Amendment protections generally apply to ballot access laws. *See, e.g.*, *Norman v. Reed*, 502 U.S. 279, 290 (1992). However, the unprecedented nature of this case, and the subsequent lack of guiding case law, requires a balancing of interests. Plaintiff's First Amendment rights must be balanced against the First Amendment rights of the electorate, as voters have a fundamental First Amendment right to cast their ballots in an orderly election. *See League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476–78 (6th Cir. 2008). Thus, Plaintiff's First Amendment claims must be weighed against the risk that confusion of the electoral process may impede the electorate's capacity to exercise its own First Amendment rights. Additionally, the Supreme Court has long recognized that states have an inherent power to regulate elections so that "they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). It is for that reason that this Court has found that a state's regulation of ballot access is an inherently compelling state interest. *See Thompson v. Dewine*, 959 F.3d 804, 811 (6th Cir. 2020). Michigan's basic interest in maintaining an orderly election—especially when the election is only weeks away—must therefore be balanced against Plaintiff's First Amendment rights. Finally, the First Amendment protections afforded to the Natural Law Party must be taken into account, inasmuch as the party would effectively be deprived of a candidate if Plaintiff was removed from the ballot. The Chair of the Natural Law Party has explained that removing Plaintiff from the ballot would leave the party in a "bad position," as it could impact the party's ability to put candidates forward in the future. *See* R. 8-5, Page ID #13.

Perhaps the most important reason for denying Plaintiff relief is that removing him from the ballot this late in the election cycle would have serious consequences for the public interest. Under Michigan law, absentee voting commences 40 days before the election—which, in this case, began on September 26, 2024. *See* Mich. Const. of 1963 art. 2, § 4(1)(h). That was nearly three weeks ago. Since that time, more than 2.5 million absentee ballots have been sent and nearly 800,000 Michiganders have returned their ballots. *See 2024 General Election Early Vote – Michigan*, University of Florida Election Lab, https://election.lab.ufl.edu/early-vote/2024-early-voting/2024-general-election-early-vote-michigan/. To remove Plaintiff from the ballot this late in the election cycle would require last-minute reprinting of millions of ballots, impose an unacceptably high burden on the Secretary of State, and cast the status of already-returned

ballots into question. Granting the relief demanded by Plaintiff would require the Secretary of State to rapidly develop an administrative process to cope with the ensuing confusion in the electoral process, which would impose an impossible burden on the state's resources. That level of chaos, this close to election day, is unacceptable and would completely disrupt the orderly administration of the upcoming election. *See Benisek v. Lamone*, 585 U.S. 155, 160 (2018); *Estill v. Cool*, 295 F. App'x 25, 27 (6th Cir. 2008).

Finally, under the Supreme Court's *Purcell* doctrine, courts are limited in the actions they can take this late in the electoral process, as court orders "can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006). The Supreme Court has therefore found that "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam). The time frame that constitutes "on the eve of the election" has not yet been defined by the Supreme Court; however, this Court has noted that injunctions issued a month before an election—as is the case here— violate *Purcell*. *See Tennessee Conf. of the Nat'l Ass'n for the Advancement of Colored People v. Lee*, 105 F.4th 888, 897 (6th Cir. 2024). Thus, requiring Michigan to upend its electoral plans, print new ballots, and reconfigure the election this late in the process would directly contravene the Supreme Court's holding in *Purcell*.

### III. CONCLUSION

At bottom, my colleagues raise no arguments that justify relitigating this case in federal court or upsetting a presidential election this late in the process. Accordingly, I respectfully concur in the denial of rehearing en banc.

---

## CONCURRENCE

---

GRIFFIN, Circuit Judge, concurring in the denial of the petition for rehearing en banc.

The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam). This is because "[c]ourt orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam).

The November general election is well underway in Michigan. More than 670,000 Michiganders have already voted.[1] Irrespective of the correctness of the Michigan Secretary of State's decision to place Natural Law Party presidential nominee Robert F. Kennedy, Jr. on the ballot, the genie is out of the bottle. At this juncture, without an effective remedy, court intervention would only further undue chaos in the ongoing election.

For this reason, I concur in the denial of the petition for rehearing en banc. I would follow "the *Purcell* principle, which seeks to avoid this kind of judicially created confusion." *Republican Nat'l Comm.*, 589 U.S. at 425.

---

[1] *More Than 670k Michigan Voters Have Cast Absentee Ballots Three Weeks Before General Election*, Mich. Dep't of State (Oct. 15, 2024), https://www.michigan.gov/sos/resources/news/2024/10/15/more-than-670k-michigan-voters-have-cast-absentee-ballots-three-weeks-before-general-election [https://perma.cc/5KAH-K53W].

————————————

**DISSENT**

————————————

THAPAR, Circuit Judge, dissenting from the denial of rehearing en banc.

"Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). When voters head to the polls, they need to have confidence in the accuracy of their ballots.

Robert F. Kennedy, Jr., suspended his presidential campaign and asked Michigan not to include his name on the ballot. He made the request before the ballots were printed. Even so, Michigan included his name over his objection (and apparently in violation of Michigan law). By doing so, Michigan forced Kennedy to be on the ballot for an office he no longer intended to seek.

This case presents a question of exceptional importance: Does forcing a person onto the ballot compel his speech in violation of the First Amendment? The repercussions of that question are enormous. If a candidate can't stop his name from appearing on the ballot, could battleground states put President Joe Biden back on their ballots? Could states put anyone they wanted on their ballots (in violation of their own election laws)?

Because these important questions implicate the integrity of our democracy and its elections, this case merited en banc review. *See* Fed. R. App. P. 35(a)(2).

I.

Kennedy ran for president as the Natural Law Party's candidate in Michigan. But in August, he withdrew from the presidential race. So he sought to have his name removed from Michigan's ballots. He made his request on August 23, 2024, before the September 6 deadline for the Secretary of State to deliver the list of presidential candidates to the county clerks. *See* Mich. Comp. Laws § 168.648 (1954) (requiring the Secretary to send this list at least 60 days before the election). However, the Secretary denied his request.

So Kennedy sued in state court, seeking declaratory, mandamus, and injunctive relief. On September 6, the Michigan Court of Appeals concluded that Kennedy had "a clear legal right to have his name removed from the ballot." *Kennedy v. Sec'y of State*, No. 372349, 2024 WL 4111159, at *4 (Mich. Ct. App. Sept. 6, 2024), *rev'd*, 10 N.W.3d 632 (Mich. 2024). The court thus issued a writ of mandamus ordering the Secretary of State to remove Kennedy's name from the ballot. The court appeared to choose mandamus over injunctive relief "given the impending deadline for the [Secretary] to send notice to local election officials." *Id.* It is unclear why injunctive relief would not have worked.

The Secretary complied by removing Kennedy's name from the ballot. She also appealed to the Michigan Supreme Court. On September 9, that court found that mandamus relief wasn't available to order Kennedy's removal from the ballot. *Kennedy v. Sec'y of State*, 10 N.W.3d 632 (Mich. 2024). The Michigan Supreme Court did *not* order Kennedy's placement on the ballot or opine on the merits. But the Secretary put Kennedy back on September 9 anyway—three days after the statutory deadline had expired on September 6.

## II.

To determine whether the Secretary violated Kennedy's First Amendment rights, we need to know who is speaking. Is Michigan saying, "Kennedy has satisfied our requirements to be on the ballot"? That would be pure government speech. Or does the ballot involve Kennedy's private speech as well? This distinction is critical: The "Free Speech Clause restricts government regulation of private speech," but "it does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). But "government speech in the literal sense" can still run afoul of the First Amendment if it "uses a means that restricts private expression . . . as is the case with compelled speech." *Shurtleff v. City of Boston*, 596 U.S. 243, 269 (2022) (Alito, J., concurring in the judgment). In other words, traditional government speech isn't protected if it restricts or compels a private citizen's expression.

Government speech is "the purposeful communication of a governmentally determined message by a person exercising a power to speak for a government." *Id.* at 268; *see also Summum*, 555 U.S. at 472 (explaining that government speech is "meant to convey and have the

effect of conveying a government message"). But the government-speech doctrine is "susceptible to dangerous misuse" when the government tries to pass off private speech as its own. *Matal v. Tam*, 582 U.S. 218, 235 (2017). So courts must carefully identify the speaker to avoid this abuse. *See Shurtleff*, 596 U.S. at 263 (Alito, J., concurring in the judgment).

Three factors help distinguish private speech from government speech: (1) the extent to which the government actively shaped or controlled the expression, (2) the history of the expression, (3) and the likely public perception as to the speaker's identity. *See id.* at 252 (majority opinion). So who shapes the speech here? The government exercises control over ballots and has done so since the late 19th century. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 356 (1997) (discussing the history of state government-controlled ballots). For example, Michigan certifies candidates, releases the ballots, and then counts them. And parts of the ballot are government speech—like instructions on how to vote. But the government doesn't alter the names of the listed candidates or their parties. The only "control" that the government exercises is ensuring that the proposed candidate has complied with the relevant election laws. And these regulations are neutral with respect to the actual content on the ballot—they apply to all candidates and parties. So the government does *not* control the precise speech here. Rather, the ballot is the government conduit that facilitates the private speech.

The third factor—public perception of the speech—strongly favors classifying Kennedy's ballot entry as private speech. After all, the public likely will perceive Kennedy as the speaker when the ballot lists him as the Natural Law Party's candidate for president. His message is: (1) I'm running for president, (2) I'm willing and able to hold office if elected, (3) I'm a member of the Natural Law Party, and (4) I'd like you to vote for me. Kennedy conveyed this message on the campaign trail for over a year. But months before the election, Kennedy suspended his campaign. He notified the Michigan Secretary of State that he no longer wanted to convey his message—and he did so well before her deadline to certify candidates. By refusing to remove Kennedy's name and then placing his message back on the ballot against his will, the Secretary compelled Kennedy to speak. And she did so in apparent violation of Michigan's own laws.

A.

Given the unprecedented nature of this dispute, there's no directly controlling precedent. But the Supreme Court's approach to distinguishing government and private speech reinforces the conclusion that the Michigan Secretary has likely compelled Kennedy's speech.

Start with the Supreme Court's decision in *Matal*.  582 U.S. at 223.  There, the Court rejected the government's argument that the Patent and Trademark Office's role in registering trademarks meant that the trademarks were government speech.  *Id.* at 239.  The PTO neither edited nor generated the trademarks.  *Id.* at 235.

Compare these two scenarios:  A company tries to get its trademark registered.  A candidate tries to get his name on the ballot.  In both cases, the government evaluates the application for compliance with the relevant legal standards.  In both cases, the government doesn't alter the trademark, the candidate's name, or party affiliation.  In both cases, the government's approval doesn't transform the underlying private speech into government speech. "[S]imply affixing a government seal of approval" by registering a trademark or listing a candidate on the ballot can't extinguish an individual's First Amendment rights.  *Id.* at 235.  That principle applies whether the government prevents a person from speaking or compels them to speak.  The First Amendment protects both rights.  *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633 (1943).

Or look at *Wooley v. Maynard*.  430 U.S. 705 (1977).  There, the Court found that New Hampshire's requirement that license plates carry the state motto, "Live Free or Die," was impermissibly compelled speech.  *Id.* at 713.  The Court could've concluded that license plates are government speech—after all, they're usually a string of numbers and letters that identify a car as registered in the state.  But the Court didn't do that.  Instead, it recognized that New Hampshire was forcing drivers to "participate in the dissemination of an ideological message" through their own private speech.  *Id.*  To be sure, the Court has held that specialty license plate designs are government speech.  *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 212–13 (2015).  The driving concern in *Walker* was the worry that the specialty design would "convey to the public that the State has endorsed that message."  *Id.* at 212.  Even so, the

Court acknowledged that the designs "also implicate the free speech rights of private persons." *Id.* at 219.

Just as government-issued license plates may include private speech, so too with ballots. The government can't force individuals to carry a message that they don't agree with, even if that message is as benign as a well-known state motto. *See Wooley*, 430 U.S. at 713. Here, the Secretary isn't just mandating that a state motto appear on candidates' electioneering materials; she is forcing Kennedy to convey the (false) message that Kennedy is running for president. In so doing, the Secretary is requiring Kennedy to continue endorsing a message he has disavowed. And for no innocuous end: She seemingly wants Michigan voters to read and rely on that false message. She can't do that. The "involuntary affirmation" of speech is an even greater affront to the First Amendment than silence. *Barnette*, 319 U.S. at 633.

Analogy to another area of First Amendment doctrine—forum analysis—sheds additional light. Ballots aren't public forums. *See Timmons*, 520 U.S. at 363 ("Ballots serve primarily to elect candidates, not as forums for political expression."). But ballots do resemble nonpublic forums (also called limited public forums). Nonpublic forums are "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Summum*, 555 U.S. at 470. So are ballots. Ballots can only be "used" by eligible voters. And ballots are dedicated solely to discussion of the current election. Moreover, ballot and nonpublic forum regulations must follow the same First Amendment rules: The regulations must be reasonable and politically neutral. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 452 (2008) (ballots); *Summum*, 555 U.S. at 470 (nonpublic forums). Finally, the Court has explicitly recognized polling places as nonpublic forums. *See Minn. Voters All. v. Mansky*, 585 U.S. 1, 12 (2018). That all favors viewing ballots like nonpublic forums, and not as government speech.

The same principles control Kennedy's compelled-association claim. The "[f]reedom of association" includes a "freedom not to associate." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984). Forcing Kennedy to appear on the ballot violates his right not to associate with a particular political party. Kennedy currently appears on the ballot under the Michigan Natural Law Party's banner. That means his name stands for a set of ideas, namely whatever the Natural Law Party's platform says. By not acting, this court allows the Secretary to force Kennedy to

continue associating with the Natural Law Party.  *See Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 892 (2018) ("The right to eschew association for expressive purposes is likewise protected.").  All told, an unbroken string of authorities teaches a simple lesson:  The government can't force free individuals to endorse particular ideas or actions.  Doing so is "always demeaning."  *Id.* at 893.

B.

Ballots don't enjoy government-speech immunity from the First Amendment.  After all, the Court has repeatedly applied First Amendment scrutiny to state ballot access laws.  *See, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 792–94 (1983); *Norman v. Reed*, 502 U.S. 279, 290 (1992).  These cases addressed candidates or parties trying to get *on* the ballot, not off.  Kennedy's suit is the flipside.  But the First Amendment still applies.  So under *Anderson-Burdick* balancing, the test we use for ballot-access cases, this dispute boils down to weighing Kennedy's First Amendment interest against the state's asserted interest in its election process.  We weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" against "the precise interests put forward by the State as justifications for the burden imposed by its rule."  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 789).

What are the asserted interests here?  As discussed, Kennedy has a strong claim to be free from compelled speech.  Michigan, for its part, has two categories of potential interests:  legal and practical.

Start with the legal.  Of course, Michigan has an interest in following its own laws.  But the Secretary's reinstatement of Kennedy on the ballot didn't advance that interest.  Michigan law seems to operate as follows:  First, the Secretary sends county clerks a list of candidates "at least 60 and not more than 90 days" before the election.  Mich. Comp. Laws § 168.648.  Then, at least 58 days before the election, the proposed ballot is put on file for public inspection and mailed to the candidates.  *Id.* § 168.710.  Each candidate then has five business days to object.  *Id.* § 168.711(4).  If there are no objections, "the county clerk is authorized to begin printing the ballots."  *Id.*

Here, Kennedy requested that his name be removed from the ballot on August 23, 2024. That was well before the 60-day deadline and before any ballots were printed or sent out. Then, on September 6 (the 60-day deadline), the Secretary sent notice to Michigan's county clerks without Kennedy's name listed. But on September 9—three days *after* the statutory deadline had passed—the Secretary sent a new notice including Kennedy's name on the ballot. She did this even though Michigan's own Director of Elections has explained that "[i]t is *critical* for the successful administration of the November 5, 2024 general election" that the "names of candidates" be finalized by "September 6, 2024." Brater Aff., R. 8-5, Pg. ID 156 (emphasis added). True, she put Kennedy back on the ballot in the wake of the Michigan Supreme Court's decision. But that narrow decision simply ruled that mandamus relief was unavailable. Crucially, the Michigan Supreme Court didn't require the Secretary to put Kennedy back on the ballot against his will. Thus, the Secretary's reinstatement of Kennedy didn't advance the state's interest in honoring its own laws. In fact, by violating Michigan's statutory deadlines, the reinstatement flouted those laws.

Nor are Michigan's practical interests in minimizing administrative burdens and ensuring the stability and integrity of its electoral process enough to trump Kennedy's First Amendment rights. This would be a different case if Kennedy had demanded his removal from the ballot *after* Michigan's 60-day deadline for notice to the county clerks had passed. And to be sure, a candidate couldn't demand his name taken off the ballot a day before the election. That would disrupt the state's practical interests in electoral stability and integrity. So, under the *Anderson-Burdick* framework, the state would have an overriding interest. But months before? The scales are weighted differently. Of course, because of the Secretary's decision to put Kennedy back on the ballot, we are now several weeks past Michigan's statutory deadline. But while this timing might have affected the remedies available to our en banc court, it can't outweigh Kennedy's asserted interest in being free from compelled speech.

III.

Two final points. First, I agree with Judges McKeague and Readler that there are serious questions about the panel's res judicata analysis that warranted our reconsideration. *See Dart v. Dart*, 597 N.W.2d 82, 88 (Mich. 1999) ("Res judicata bars a subsequent action between the same

parties when the evidence or essential facts are identical."). That's especially true given the important First Amendment and election integrity interests at stake.

Second, I recognize that *Purcell* "ordinarily" counsels against federal court intervention as an election approaches. *Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 30 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay). Why? To prevent "voter confusion" and "election administrator confusion." *Purcell*, 549 U.S. at 4–5; *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring in grant of applications for stays). If the goal of *Purcell* is to protect voters from confusion, it's hard to see how *Purcell* cuts against an order preventing a state from affirmatively misleading its voters regarding who's running for president. Perhaps that's why *Purcell* isn't an "absolute" rule. *Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring in grant of applications for stays). Sometimes, judicial intervention may be warranted to ward off the very voter confusion that *Purcell* normally worries it could create. And in this unique case, it wouldn't be confusing for election administrators to simply remove Kennedy's name from the election-day ballots. At the very least, we could have assessed the feasibility of doing so by hearing this case en banc.

\*          \*          \*

To sum up, the Secretary's reinstatement of Kennedy on the ballot unconstitutionally compels Kennedy's speech and violates Michigan's own deadlines. It also forces Kennedy to be on the ballot for an office he no longer intends to hold if he were to win. And it has the unfortunate result of potentially misleading Michigan voters. *See Wash. State Grange*, 552 U.S. at 460 (Roberts, C.J., concurring) ("[W]hat makes the ballot 'special' is precisely the effect it has on voter impressions."). Finally, this all happens at a time when it is crucial for state governments to assure voters of the integrity of their elections.

Presidential elections "implicate a uniquely important national interest." *Anderson*, 460 U.S. at 794–95. If this case didn't raise "question[s] of exceptional importance" appropriate for en banc review, it's hard to imagine what case would. Fed. R. App. P. 35(a)(2). I respectfully dissent from the denial of rehearing en banc.

————————————

**DISSENT**

————————————

READLER, Circuit Judge, dissenting from the denial of rehearing en banc.  Without explanation, and in violation of state law, the Michigan Secretary of State belatedly added Robert F. Kennedy Jr.'s name to the 2024 general election ballot for the office of president after previously granting Kennedy's lawful request not to be included on the ballot.  In turn, Kennedy sought emergency relief in the district court to enjoin the Secretary's action.  The district court denied Kennedy's request, and a divided panel of this Court affirmed on procedural grounds.  Because Kennedy has demonstrated a likely violation of his constitutional rights, because he has otherwise satisfied the remaining factors warranting preliminary relief, and because this case presents exceptionally important questions of election law tied to the presidential election, I respectfully dissent from the denial of rehearing en banc.

I.

Michigan's Natural Law Party nominated Robert F. Kennedy Jr. as its candidate for president in April 2023.  Kennedy was nominated in most other states as well, sometimes via a different political party.  For over a year, Kennedy gained notoriety as a potentially viable third-party candidate, in a race against the two most recent presidents.  But in late July 2024, the sitting president unexpectedly dropped his bid for reelection.  He was replaced as a candidate by his vice-president in mid-August, dramatically shifting the nature of the race.

Noting those changes, and believing that his role in the race had been reduced to merely a "spoiler" in the so-called "battleground states," Kennedy suspended his campaign on August 23. Robert F. Kennedy, Jr., Address to the Nation (Aug. 23, 2024), *available at* https://perma.cc/LBJ6-GF64 ("I'm going to remove my name, and I've already started that process and urge voters not to vote for me.").  Around the same time, he requested that his name not be included on the ballot in the aforementioned battleground states—Arizona, Florida, Georgia, Michigan, Nevada, North Carolina, Ohio, Pennsylvania, Texas, and Wisconsin. Virtually every state acceded to Kennedy's request, and in reasonably short order.  *See* Ariz.

Sec'y of State, *Candidate Statement of Voluntary Withdrawal Receipt* (Aug. 22, 2024, 6:02 PM) ("[Kennedy's name] will not be printed on the November 5, 2024 General Election Ballot in Arizona."); Order, *In re Nomination Petition of Robert F. Kennedy*, No. 386 M.D. 2024 (Pa. Commw. Ct. Aug. 23, 2024) ("The Secretary of [Pennsylvania] shall not include Robert F. Kennedy, Jr. and Nicole Shanahan as candidates for President and Vice President of the United States on the November 5, 2024 General Election Ballot."); Juan Salinas II, *Robert F. Kennedy Jr. Ends Campaign, Endorses Trump, Withdraws from Texas Ballot*, Tex. Trib. (Aug. 23, 2024, 4:00 PM), https://perma.cc/TWJ8-KEPP ("Kennedy has withdrawn from being on the Texas ballot."); Frank LaRose (@FrankLaRose), X (Aug. 23, 2024, 5:34 PM), https://perma.cc/L4P4-GRMS ("[Kennedy] will not appear on the Ohio ballot."); *Wittenstein v. Kennedy*, No. 2502869 (Ga. Off. Admin. Hearings Aug. 26, 2024) ("Accordingly, [Kennedy] is NOT QUALIFIED to be appear on the ballot in Georgia for the office of President of the United States."); Stipulation & Order of Dismissal, *Rockenfeller v. Kennedy*, No. 24 OC 00111 1B (Nev. 1st Jud. Dist. Aug. 27, 2024) ("[Kennedy's] name[] shall not appear on the November 2024 general election ballot in Nevada."); Email from Mark Ard, Dir. of External Affs., Fla. Dep't of State, *quoted in* C. A. Bridges, *Will Robert F. Kennedy Be on the Florida Ballot After Dropping Out, Endorsing Trump?*, Tallahassee Democrat (Aug. 29, 2024, 2:53 PM), https://perma.cc/73ND-AM5Y ("[Kennedy's name] will not appear on Florida's ballot."); *Kennedy v. N.C. State Bd. of Elections*, 905 S.E.2d 55, 58 (N.C. 2024) (order) ("[T]he [North Carolina] Court of Appeals properly issued its writ of supersedeas to prevent the dissemination of inaccurate ballots [containing Kennedy's name].").

But not Michigan. There, the Secretary of State denied Kennedy's request not to be included on the ballot. Accordingly, he sought mandamus relief in state court to effectuate his withdrawal from the race. Kennedy was initially rebuffed in the court of claims. But on September 6, the Michigan Court of Appeals unanimously reversed and remanded, instructing the lower court to issue the requested relief.

September 6 was important for another reason. As the date coincided with the start of the 60-day window before the election, the Secretary was required on that day to "send to the county clerk of each county a notice . . . specifying . . . the federal . . . offices for which candidates are to

be nominated." Mich. Comp. Laws § 168.648 (1979). The Secretary did so, delivering the list of presidential candidates to Michigan's 83 county clerks. Kennedy's name was not on that list. When the Supreme Court later vacated the intermediate court's ruling on process grounds, the Secretary had an apparent change of heart. Three days later, she updated the candidate list to add Kennedy's name, and then circulated the revised list, notwithstanding § 168.648's deadline for doing so having expired.

Kennedy turned to federal court, seeking emergency relief to have his name removed from the ballot. When the district court and a panel of this Court denied Kennedy's request, he asked the full Court to resolve his case.

## II.

Four factors govern whether a district court should grant a preliminary injunction: (1) the likelihood that the movant will succeed on the merits, (2) whether the party moving for the injunction is facing immediate, irreparable harm, (3) the balance of the equities, and (4) the public interest. *Mich. State AFL-CIO v. Schuette*, 847 F.3d 800, 803 (6th Cir. 2017). We review a district court's decision denying injunctive relief for an abuse of discretion, while considering any embedded legal determinations de novo. *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021).

A.1. Kennedy has shown a strong likelihood of success on the merits. Consider again the factual backdrop. A state official mandated a former candidate's appearance on the presidential ballot over the candidate's objection. That fact alone would likely strike any reasonable observer as odd. Then consider that the official did so in the face of the former candidate's assertion of his First Amendment right not to be compelled to appear as a candidate. And consider further that the state official did so after she had previously honored the former candidate's request not to have his name included on the ballot, and after the state's statutory deadline for placing candidates on the ballot had passed.

a. Adding all of this together, the Secretary's decision is deeply suspect, legally and otherwise. Political candidates enjoy certain First Amendment rights in seeking access to the ballot. *See Am. Party of Tex. v. White*, 415 U.S. 767, 788–89 (1974); *see also Storer v. Brown*,

415 U.S. 724 (1974). A logical corollary of this "unexceptionable" principle is that the First Amendment similarly forbids states from unduly burdening a political candidate's ability to take his name off the ballot. *Cf. Am. Party of Tex.*, 415 U.S. at 788. And for good reason. Forcing a political candidate to remain on the ballot without reasonable justification burdens his "right to eschew association." *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463–64 (2018). Why? Because it requires him to convey the message that he is still seeking votes for office. *Id.*

In the end, the Secretary did not respect those freedoms. Initially, to be sure, the Secretary did act on Kennedy's timely request. As mentioned, the Michigan legislature required the Secretary to place political candidates on the presidential ballot no later than September 6. In advance of this deadline, Kennedy requested that his name not be included on Michigan's ballot. The Secretary honored this command. Consistent with the statutory deadline, the Secretary circulated the list of candidates for president on September 6. It did not include Kennedy. Yet three days later, after the deadline for certifying the list of candidates had passed, the Secretary revised the list, adding Kennedy's name to the ballot. As the district court suggested, no statute authorized the Secretary essentially to reinstate Kennedy's campaign for presidential votes in Michigan. *Kennedy v. Benson*, --- F. Supp. 3d ---, No. 24-12375, 2024 WL 4231578, at *4 (E.D. Mich. Sept. 18, 2024) (stating that the Secretary's decision to "change the names of candidates after the deadline . . . may have exceeded the bounds of her office").

The Secretary's actions thus run headlong into different, but related, First Amendment principles. First, the Secretary has likely unduly burdened Kennedy's right not to be included on the presidential ballot, as forcing him to appear compels a message that he is in fact a candidate. *Cf. Am. Party of Tex.*, 415 U.S. at 788–89; *Storer*, 415 U.S. at 738. Second, by those same acts, the Secretary has likely burdened Kennedy's "right to eschew association" with his presidential election campaign. *See Janus*, 138 S. Ct. at 2463–64; *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). As Judge Thapar likewise agrees, when a state official arbitrarily places a former political candidate's name on a presidential ballot against his wishes, after she had previously excluded him from the ballot, and after the state's legislatively imposed deadline for certifying candidates has passed, that official seemingly compels the candidate to convey a message to

voters, in violation of the First Amendment.  *Wooley*, 430 U.S. at 714; *see also* Thapar Dissenting Op.

Admittedly, case law in this context is sparse.  That is likely because individuals are not routinely forced onto a ballot.  *See* Appendix A, *infra* (listing representative examples reflecting that state officials, for over a century, have removed candidates from the ballot at the candidate's request).  As just one example, an incumbent United States Senator was allowed to drop his candidacy at the same time Kennedy sought to do so.  *See* Kristie Cattafi, *Sen. Bob Menendez Ends Independent Candidacy for Senate, Will Come Off NJ Ballots*, NorthJersey.com (Aug. 18, 2024, 1:31 PM), https://perma.cc/8U4V-4K64.  And as already mentioned, virtually every other state where Kennedy sought not to be listed as a candidate honored his request.

Consider the asymmetries in Michigan's 2024 presidential ballot alone.  One major party candidate dropped out of the race just weeks before his party's late-August convention, and after winning every state party primary, including Michigan.  The week after that convention, Kennedy sought to do the same, in large part due to his rival's departure from the race.  The Secretary voiced no concern over the former.  *See* John Wisely, *New Democratic Nominee Can Be Placed on Michigan Ballots, Benson and Nessel Say*, Detroit Free Press (July 22, 2024, 6:42 PM), https://perma.cc/2YPF-J3SA.  Yet she fights tooth and nail to oppose the latter.   With all of this in mind, it becomes evident that, even under the First Amendment's most forgiving level of scrutiny—rational basis review—the Secretary's unusual actions do not pass muster.  In the end, the Secretary never explains why she tainted the state's presidential ballot with the name of an individual who is not seeking office, after previously excluding him.  *See Tiwari v. Friedlander*, 26 F.4th 355, 361 (6th Cir. 2022) (stating that government actions "premised on utterly illogical grounds . . . will not be upheld" on rational basis review).  Nor has the Secretary identified a historical practice justifying her approach.  *See Daunt v. Benson*, 956 F.3d 396, 422 (6th Cir. 2020) (Readler, J., concurring in judgment).  Rather, history says just the opposite as to candidates who seek exclusion in a timely manner.  *See* Appendix A, *infra*.

Further animating Kennedy's First Amendment claims are concerns about the process by which his name was forced onto Michigan's presidential ballot.  The Constitution vests the "Legislatures" of each state with power to carry out the rules governing federal elections.

*See* U.S. Const. art. I, § 4, cl. 1 (congressional elections); *id.* art. II, § 1, cl. 2 (presidential electors); *Democratic Nat'l Comm. v. Wis. State Leg.*, 141 S. Ct. 28, 29 (2020) (Gorsuch, J., concurring) ("The Constitution provides that state legislatures—not federal judges, not state judges, not state governors, not other state officials—bear primary responsibility for setting election rules."). This language was a "deliberate choice that [we] must respect," and we have an "obligation" to ensure that a state does not take action to "evade" the Constitution's commands. *Moore v. Harper*, 143 S. Ct. 2065, 2088 (2023).

Here, there is no doubting the legislative command as to who can appear on the ballot for the federal office of the presidency: those specified by the Secretary in her notice sent "at least 60 days" before the election. § 168.648. This instruction is express and unambiguous. And the practice is decades old. Yet the Secretary disobeyed that order, amending the list of candidates after the statutory deadline again, to, of all things, include a formerly withdrawn candidate, over his objection. In so doing, the Secretary seemingly "arrogate[d]" to herself the "power vested in state legislatures to regulate federal elections." *Moore*, 143 S. Ct. at 2089. In the process, she put Michigan voters at risk of casting their weighty presidential vote for a non-candidate. *See* Geoffrey Skelley, *The 2024 Election Could Come Down to a Single Tipping-Point State*, ABC News (Sept. 30, 2024, 5:59 PM), https://perma.cc/W687-Z6H9 ("Pennsylvania and Michigan [are] most likely to decide a one-state race.").

b. Against all of this, the Secretary now responds in her briefing to the en banc court that § 168.648 merely sets the earliest and latest dates for identifying and transmitting the positions up for election. *See* Resp. to Pl.'s Pet. for Reh'g En Banc at 7–9. In her view, because no statute affirmatively prohibits her from certifying the names of the candidates for these positions after a certain date, her conduct was entirely lawful. *Id.* at 10. The Secretary forfeited this argument, however, by failing to raise it before the district court. *See Kennedy*, 2024 WL 4231578, at *4 (district court noting "[t]he parties do not dispute that [the Secretary] was required by statute to certify the names of the candidates by September 6" and that she "has not provided any statutory authority for [recertifying the names]"); *see also Kennedy v. Benson*, No. 24-1799, 2024 WL 4327046, at *6 (6th Cir. Sept. 27, 2024) (McKeague, J., dissenting) ("To date, Secretary Benson

has not identified any statute, rule, or court order that required her—or even permitted her—to add a candidate to the ballot after the statutory deadline.").

In any event, her reading of § 168.648 has numerous flaws. For one, it ignores how the phrase "for which candidates are to be nominated or elected" contextualizes the meaning of "offices." The Secretary views the statute as requiring her merely to announce by September 6 a fact obvious to all—that a presidential election will take place in November. But that understanding ignores the textual requirement that "candidates" be paired with each "office[]." *See People v. Lee*, 526 N.W.2d 882, 885 (Mich. 1994) ("Where the language used is clear and the meaning of the words chosen is unambiguous, a common-sense reading of the provision will suffice, and no interpretation is necessary." (quotation omitted)). For another, her view of her authority—that she can act until a statute affirmatively prohibits her conduct—belies basic separation of powers considerations undergirding the Michigan constitution. *See UAW v. Green*, 870 N.W.2d 867, 874 (Mich. 2015) ("Where the means for the exercise of a granted power are given, no other or different means can be implied, as being more effective or convenient." (citation omitted)); *Soap & Detergent Ass'n v. Nat. Res. Comm'n*, 330 N.W.2d 346, 350 (Mich. 1982) ("It is beyond debate that the sole source of an agency's power is the statute creating it."). Equally problematic, her view eliminates any semblance of a timeliness requirement in § 168.648. If the law affords the Secretary complete discretion in deciding not only which candidates to place on the ballot, but also when to do so, she ostensibly could modify the ballot on an election's eve.

There is even more peculiarity to the Secretary's position. And this one may be the most glaring. If she is correct in her reading of § 168.648, then she is fully authorized to remove from the ballot a candidate not seeking office, as Kennedy requests. Yet wielding this authority, the Secretary fails to explain why she nonetheless forced Kennedy onto the ballot over his objection, and to the voters' collective detriment. Instead, she seemingly takes the view that candidates for office are akin to the ill-fated guests of the Hotel California: "You can check out [of the race] anytime you like, but," as for the ballot, "you can never leave." Eagles, *Hotel California*, at 4:15, *on* Hotel California (Asylum Records 1977).

Nor can I agree with the Secretary that the Michigan Supreme Court required her to place Kennedy's name on the ballot. Michigan's high court ordered no such thing. *See generally Kennedy v. Sec'y of State*, 10 N.W.3d 632 (Mich. 2024) (order). Recall the case's history. Kennedy filed suit seeking a writ of mandamus to prevent his name from being included on the ballot. When the Michigan Court of Appeals ordered the Secretary to honor Kennedy's request, the Secretary complied, without even asking that court to stay its decision, nor even seeking a simple administrative stay of the order. While the Michigan Supreme Court ultimately disagreed with Kennedy's request, it did not order the Secretary to do the opposite, mandating that Kennedy's name be placed on the ballot after the deadline for doing so. *See id.* Which makes sense. After all, no one asked the Michigan Supreme Court to order that Kennedy's name be included on the ballot. In the end, it was the Secretary's decision to include Kennedy as a candidate, one that ran afoul of a host of constitutional and pragmatic concerns.

Query who would even have a cognizable basis for objecting to Kennedy's pre-deadline decision not to run? The Secretary does not identify anyone to that effect. Judge Clay, for his part, believes Kennedy's First Amendment interests must bend to the Natural Law Party's desire to have a candidate on the Michigan ballot. *See* Clay Concurring Op. at 8. As a legal matter, however, it is difficult to believe a political party's interest in fielding a candidate would ever trump an individual's desire not to appear on the ballot. Tellingly, Judge Clay cites no case to that effect. Equally true, as a practical matter, were there concerns about the Natural Law Party's future prospects, the Secretary could have replaced Kennedy on the ballot with another candidate selected by the Party before the September 6 deadline, and certainly before voting began in late September, assuming the Secretary holds the power she purports to wield.

One last point. Judge Clay suggests that the inescapable legal harms caused by the Secretary's actions are undermined by Kennedy's pursuit of presidential votes in other states, including New York. From a political science perspective, one might well question Kennedy's approach to waging a presidential election. But as a legal matter, his motives are irrelevant. Whether Kennedy is acting in a "selfish[]," "contradictory," or even self-defeating way, Clay Concurring Op. at 8, he enjoys First Amendment freedoms nonetheless. Those "protections," it bears reminding, do not "belong only to speakers whose motives the

government finds worthy; its protections belong to all, including to speakers whose motives others may find misinformed or offensive." *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2317 (2023) (citing *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 468 (2007) (opinion of Roberts, C.J.) (observing that "a speaker's motivation is entirely irrelevant" (citation omitted))). In the end, "we presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 791 (1988).

\* \* \*

It should go without saying that not every state law violation has federal constitutional reverberations. State rules governing access to the ballot are longstanding, and their enforcement rarely justifies federal court intervention. But here we encounter a candidate being forced onto the presidential ballot, in the face of his timely request to not be so included, and after the Secretary initially honored that request, only to change her mind beyond the point the statutory deadline allowed her to do so. Along the way, numerous constitutional protections were disregarded. Such blatant illegality in a presidential race justifies a federal remedy.

2. The timing of the Secretary's conduct bears further emphasis. Just two months before the election, she materially altered Michigan's presidential ballot. A familiar principle requires federal courts to favor the status quo in state election procedures rather than allowing their disruption in the lead up to an election. *See Purcell v. Gonzalez*, 549 U.S. 1, 5–6 (2006) (per curiam). The rationale for the *Purcell* principle is straightforward: election rules should be clear, and last-minute changes to those rules muddy the waters at significant cost to voters, the administration of law, and public confidence in the election. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020); *Democratic Nat'l Comm.*, 141 S. Ct. at 30–31 (Kavanaugh, J., concurring). So when faced with a last second challenge to a state election law, *Purcell* counsels against disturbing the existing state of affairs. But the "same rationale" requires federal court action to "prevent election interference" by state executive agencies. *Carson v. Simon*, 978 F.3d 1051, 1062 (8th Cir. 2020) (per curiam); *Wise v. Circosta*, 978 F.3d 93, 111 (4th Cir. 2020) (Wilkinson & Agee, JJ., dissenting) ("*Purcell* . . . operates to bar [a state agency] from changing the rules at the last minute . . . .").

Here, the Michigan legislature set the rules for the election well in advance. As established by Michigan law, the status quo included a September 6 deadline as to who will appear on the presidential ballot. In an orderly process, and in advance of that deadline, Kennedy ensured that he was not so included. But the Secretary then upset the status quo by unilaterally changing the rules of the game. Settled election law precedent weighs against that effort. "[I]t is our duty, consistent with *Purcell*," to preserve what remains of the established state of play as of September 6. *Carson*, 978 F.3d at 1062. Especially so, it bears repeating, when the Secretary has never explained why she would upset the status quo for the peculiar purpose of adding a non-candidate's name to the presidential ballot.

3. The panel majority opinion faulted Kennedy for the timing of his suit, not its merits. Both the Secretary and the panel majority opinion believe that Kennedy's claims are substantively identical to those raised in state court, *see Kennedy*, 2024 WL 4327046, at \*2–4, rendering them precluded under Michigan res judicata principles, *see* 28 U.S.C. § 1738; *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985) ("[Section 1738] directs a federal court to refer to the preclusion law of the State in which judgment was rendered."). As a starting point, it is not clear what preclusive value the denial of mandamus relief in state court has for future litigation, given the narrow context in which mandamus cases are decided. *See Salisbury v. City of Detroit*, 249 N.W. 841, 841 (Mich. 1933) (holding that a mandamus denial did not have preclusive effect in a future, related case as a mandamus court addresses only whether "to enforce a plain positive duty" owed by the respondent). In any event, before deeming a claim to be precluded, Michigan law requires that a court confirm "the matter contested in the second action was or could have been resolved in the first." *Dart v. Dart*, 597 N.W.2d 82, 88 (Mich. 1999).

Recall two things about the challenged conduct here. One, Kennedy seeks to have his name removed from the ballot based upon the Secretary's conduct on September 9, three days after the September 6 deadline, whereas his earlier case, pursued in advance of September 6, sought to have his name not included on the list of candidates to be circulated by the Secretary. Two, the challenged conduct here occurred only after the Michigan Supreme Court issued its opinion and order in the earlier case. Taking these points together, this appeal concerns the

Secretary's unlawful action on September 9, a dispute that could not possibly have been resolved in the original state-court litigation. So res judicata principles tied to the earlier litigation do not stand in the way of resolving this case's merits. *See Kennedy*, 2024 WL 4327046, at *5 (McKeague, J., dissenting).

It may be true, as the Secretary and panel emphasize, that Michigan "employs a broad view of res judicata." *Kennedy*, 2024 WL 4327046, at *2 (quotation omitted) (majority opinion). Yet resting matters there overlooks a key caveat: res judicata applies only to claims that "the parties, exercising reasonable diligence, might have brought forward at the time." *In re MCI Telecomms. Complaint*, 596 N.W.2d 164, 183 n.7 (Mich. 1999) (quoting *Hackley v. Hackley*, 395 N.W.2d 906, 907 (Mich. 1986)). That understanding is part and parcel with the related point that parties must pursue actual controversies, not future ones that may never arise. *See League of Women Voters of Mich. v. Sec'y of State*, 957 N.W.2d 731, 743–44 (Mich. 2020) (explaining that Michigan standing doctrine requires "a present legal controversy, not one that is merely hypothetical or anticipated in the future" (quotation omitted)). Understandably, even the most diligent party cannot anticipate, let alone litigate, a Secretary of State's future violation of state law, one that reversed an earlier, lawful decision.

No more availing is the panel majority opinion's characterization of this case as merely a "re-run" of Kennedy's prior lawsuit. *Kennedy*, 2024 WL 4327046, at *4. To be sure, the state court litigation and this appeal share the broader context of Kennedy's attempt to not be included on Michigan's presidential ballot. But they depart on a fact pivotal to Kennedy's argument today: the Secretary has since added Kennedy's name to the list of candidates, after previously excluding it, in violation of Michigan law. That illegal conduct invites the host of constitutional questions outlined above, which materially vary from, and could not have been feasibly raised in, Kennedy's state court litigation. Take, for example, both the state separation-of-powers and *Purcell* arguments here. Each centers on the Secretary illegally usurping the Michigan legislature's role in setting election rules, and thereby upsetting the status quo. That conduct occurred only after the Michigan Supreme Court issued its decision, and thus was not sufficiently foreseeable during the state court litigation. Consider next Kennedy's compelled speech claim. True, his state complaint also raised a compelled speech claim. But Kennedy's

argument in state court involved only the alleged compulsion of speech triggered by the Secretary desiring to add his name to the ballot pre-deadline, over his objection. This appeal, on the other hand, involves the Secretary's illegal, post-deadline addition of Kennedy's name to the ballot after previously doing otherwise. That affirmative misconduct raises distinct concerns of unconstitutionally compelled speech, and likewise disrupts the status quo established by the September 6 deadline. *See Janus*, 138 S. Ct. at 2464. It also usurps the authority of the Michigan legislature, casting doubt over the integrity of the state's electoral process. As "the evidence or essential facts" between the two lawsuits are not "identical," indeed, far from it, Michigan res judicata principles do not bar today's action. *Dart*, 597 N.W.2d at 88.

I agree with the panel dissent that the Secretary's remaining procedural grounds for dismissing Kennedy's suit are likewise meritless. *See Kennedy*, 2024 WL 4327046, at \*7–8 (McKeague, J., dissenting) (rejecting laches and *Rooker-Feldman* defenses). Because Kennedy has a high likelihood of success on the merits of his claims, I turn to the remaining considerations in weighing a request for injunctive relief.

B. Those factors also counsel in favor of issuing the preliminary injunction. To demonstrate irreparable harm, Kennedy must face the prospect of ongoing and immediate injury to his constitutional rights. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (recognizing that loss of constitutional "freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). With an election pending—one for which his name has been forced on the ballot over his objection—his injury is quintessentially irreparable.

As to the equities and the public interest, both factors, as Judge McKeague aptly observed, likewise point in Kennedy's direction. Start with the equities. The Secretary's decision to belatedly add a withdrawn candidate to the ballot, over the candidate's objection no less, was head scratching, unnecessary, and, in the end, lawless. Nor is the public interest served by adding a frivolous presidential candidate to the field, stoking voter confusion and undermining the election's integrity. *See* 2024 WL 4327046, at \*6 (McKeague, J., dissenting).

C. That leaves a more challenging question: how to remedy Kennedy's injury? Ideally, the Secretary should satisfy Kennedy's request to withdraw from the Michigan ballot as a

candidate for president.  This would comport with the other jurisdiction that has addressed the matter.  *See Kennedy*, 905 S.E.2d at 58 ("We acknowledge that expediting the process of printing new ballots will require considerable time and effort by our election officials and significant expense to the State.  But that is a price the North Carolina Constitution expects us to incur to protect voters' fundamental right to vote their conscience and have that vote count.").  The Secretary worries that this solution would spark disarray and cast doubt over the integrity of Michigan's electoral process.  Regrettably, the Secretary's actions have already done just that.  Remedial efforts would help stem the unfortunate tide unleashed by the Secretary.  To uphold the Secretary's actions on the basis that the ensuing damage is not easily remedied would be to reward that conduct, a perverse outcome indeed.  *Cf. Arnett v. Kennedy*, 416 U.S. 134, 154 (1974) ("[A] litigant in the position of appellee must take the bitter with the sweet.").

At the same time, it is fair to recognize the burdens tied to granting the sought-after injunction as written.  After all, early in-person and absentee voting has already commenced.  Yet other remedies remain.  They include:  (1) reissuing ballots to be used on election day with Kennedy's name removed from the list of candidates for president; (2) notifying, in a writing delivered to the mailing address of every Michigan voter who has received or will receive an absentee ballot, that Kennedy is no longer a candidate for president; and (3) posting conspicuous notice in early in-person polling places that Kennedy is no longer a presidential candidate.  *Cf. In re Nader*, 865 A.2d 8, 19 (Pa. Commw. Ct. 2004), *aff'd*, 860 A.2d 1 (Pa. 2004) (ordering removal of candidate's name from ballot 20 days before election); *Ramirez v. Chi. Bd. of Election Comm'rs*, 151 N.E.3d 206, 215 (Ill. App. Ct. 2020) (ordering removal of candidate's name and postage of notice "reasonably calculated to inform voters that votes cast for [candidate] will be suppressed" 25 days before election); *Askew v. Firestone*, 421 So. 2d 151, 156 (Fla. 1982) (ordering that proposed constitutional amendment be stricken from ballot 12 days before election); *Holloway v. Byrne*, 874 A.2d 504, 505 (N.J. 2005) (order) (ordering reprinted and remailed absentee ballots 20 days before election); *Wilson v. Hosemann*, 185 So. 3d 370, 380 (Miss. 2016) (ordering addition of candidate's name to ballot 11 days before election).  These commonsense solutions could have been ordered well before now, and could still be implemented today.  Regrettably, the panel failed to order any of them.  Michigan's presidential election is worse off for it.

---

**APPENDIX A**

---

1. *Bordwell v. Williams*, 159 P. 869, 869–70 (Cal. 1916) ("The right to seek election to any office is open to all persons possessing the constitutional or statutory qualifications.  A citizen is, however, under no obligation to seek election to an office.  He may be a candidate, or refuse to be such, at his option, and, in the absence of statutory provision to the contrary, the mere fact that he has once announced his candidacy for an office does not prevent him from withdrawing as a candidate whenever he sees fit so to do.").

2. *State ex rel. La Follette v. Hinkle*, 229 P. 317, 319 (Wash. 1924) ("If at one time Mr. La Follette gave consent to the use of his name [as a candidate for president], it was nothing more than a bare license or permission which may be revoked by him at any time . . . .").

3. *State ex rel. Rogers v. Hunt*, 81 P.2d 883, 884 (Wyo. 1938) ("[I]n the absence of statutory regulation or prohibition a candidate has a natural right to withdraw, if his application be made in time to enable the officials to have the necessary alterations put in effect." (citation omitted)).

4. *Conroy v. Nulton*, 48 A.2d 831, 832 (N.J. 1946) ("It seems apparent that the right of a candidate to resign is an inherent right of the individual, subject to reasonable legislative restrictions.").

5. *Introcaso v. Burke*, 65 A.2d 786, 787 (N.J. Super. Ct. Law Div. 1949) ("The right of a candidate for public office to resign is an inherent right of the individual.  The right, however, must give way to reasonable legislative restrictions . . . ." (citation omitted)).

6. *Black v. Bd. of Supervisors of Elections*, 191 A.2d 580, 582 (Md. 1963) ("It appears to be well settled that in the absence of a statutory prohibition against resignation a candidate has a natural or inherent right to resign at any time and to have his name deleted from the ballot.").

7. *Battaglia v. Adams*, 164 So. 2d 195, 198 (Fla. 1964) ("[I]t appears to be generally held that, in the absence of statutory inhibition, a candidate has a natural or inherent right to resign at any time and to have his name deleted from the ballot.").

8. *Clark v. Patterson*, 137 Cal. Rptr. 275, 279 n.4 (Cal. Ct. App. 1977) ("Absent a statutory provision to the contrary, the common law rule is that a person who declares himself a candidate has an implied power to withdraw his name.").

9. *New Jersey Democratic Party, Inc. v. Samson*, 814 A.2d 1025 (N.J. 2002) (order) (permitting Robert Torricelli to remove his name from the ballot as a candidate for the United States Senate in the general election).

10. *Taylor v. Kobach*, 334 P.3d 306 (Kan. 2014) (permitting Chad Taylor to remove his name from the ballot as a candidate for the United States Senate in the general election).

11. 29 C.J.S. *Elections* § 183 (2024) ("Under the common law and under statute, a candidate for public office has the right to withdraw his or her candidacy. However, to be valid and effective, it is essential that such withdrawal be made in the manner and filed within the time prescribed by statute." (citations omitted)).

12. 26 Am. Jur. 2d *Elections* § 206 (2024) ("A citizen may refuse to be a candidate and seek withdrawal of a nomination, at his or her option.").

———————————

**STATEMENT**

———————————

McKEAGUE, Circuit Judge,**[1]** a statement respecting the denial of rehearing and the denial of rehearing en banc.  In defiance of the U.S. Constitution and state election law, Michigan Secretary of State Jocelyn Benson manipulated the presidential ballot in Michigan. Robert F. Kennedy, Jr. first attempted to withdraw from the election on August 23, weeks before any ballots were printed.  Secretary Benson refused, relying on a dubious interpretation of state law.  The parties went to state court, and the Michigan Court of Appeals ordered Secretary Benson to remove Kennedy's name from the ballot.  On September 6, Secretary Benson complied with that order and issued the call of the election to the county clerks *without* Kennedy's name on the ballot.  But then three days later—and three days after the statutory deadline—she *added* his name back on the ballot.

Why?  Tellingly, her explanation has changed over time.  Before the district court, Secretary Benson did not provide *any* justification for post-deadline ballot change.  *See Kennedy v. Benson*, No. 24-12375, 2024 WL 4231578, at *4 (E.D. Mich. Sept. 18, 2024) (noting that Secretary Benson "has not provided any statutory authority" for "chang[ing] the names of candidates after the deadline").  But before the three-judge panel of this court, Secretary Benson stated that she was "acting on judicial authority" from the Michigan Supreme Court.  And now, in response to the petition for rehearing en banc, Secretary Benson claims that (1) state law only requires her to notify the county clerks of the "offices" up for election, rather than the "specific candidates";**[2]** (2) state law does not prohibit her from changing the list of candidates after the

———————————

**[1]**I was a member of the panel that considered this case.  I dissented.  Because I am a judge of this court in senior status, I cannot vote to rehear a case en banc or join a dissent from a denial of rehearing en banc.  *See* 28 U.S.C. § 46(c); Fed. R. App. P. 35(a).  I construe this court's policies, however, to permit a statement regarding an order granting or denying en banc review.

**[2]**This claim contradicts an affidavit submitted by Secretary Benson in the district court, which stated that "[i]t is critical . . . that the Bureau of Elections inform counties of the *names of candidates* appearing on ballots by 60 days before the election (in this case September 6, 2024)."  Brater Aff., R.8-5 at PageID 156 (emphasis added).

deadline; and (3) the Michigan Supreme Court "ordered" her to "revise her initial notice."**3** As Judge Readler correctly explains in his dissent from the denial of rehearing en banc, there are numerous flaws with Secretary Benson's reasoning.  But perhaps more importantly, her inconsistent post hoc explanations leave us searching for the *real* reason why she put Kennedy's name back on the ballot.

No matter how many justifications Secretary Benson can conjure up, the outcome is the same: putting Kennedy's name on the ballot will mislead Michigan voters.  It will trick them into thinking that Kennedy is still vying to be the President of the United States. Secretary Benson's actions violated Kennedy's First Amendment rights and defy basic common sense.

For the reasons articulated in my panel dissent and the thoughtful dissents from the denial of rehearing en banc by Judge Thapar and Judge Readler, I regret that our court declines to hear this case en banc.  I am particularly disappointed by this court's refusal to consider even modest relief, such as placing notices at polling places which state that Kennedy is no longer running for President.  This form of relief was deemed appropriate in other states, but apparently not in Michigan.  *See Al-Bari v. Pigg*, No. S25A0177, 2024 WL 4284250, at *2 (Ga. Sept. 25, 2024) (noting that when two presidential candidates were disqualified after ballots were printed, the Georgia Secretary of State agreed to place "prominent notice[s]" at polling places "advising voters of the disqualification of the candidate[s]" (alterations in original)).  Such relief would not "alter the election rules," but rather minimize the risk of voter confusion created by Secretary Benson's actions.  *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020).

Standing idly by in the face of this constitutional violation is a disservice not only to Kennedy, but to all Michigan voters.  In an extremely close presidential election, the presence of a third-party candidate on the ballot can be decisive.  *See* Rebecca Davis O'Brien & Taylor

---

**3**This claim differs from Secretary Benson's prior characterization of the Michigan Supreme Court order. In her initial brief on appeal, she correctly described the order as "holding that the Secretary of State had no duty to accept [Kennedy's] withdrawal."  Appellee Br. 38.  As I stated previously, the Michigan Supreme Court's holding was simple: Kennedy was not entitled to mandamus relief.  The order did not compel Secretary Benson to do anything, and it certainly did not order her to change the ballot after the statutory deadline.  *See Kennedy v. Benson*, No. 24-1799, 2024 WL 4327046, at *8, *10 (6th Cir. Sept. 27, 2024) (McKeague, J., dissenting).

Robinson, *In a Tight Race, Third-Party Candidates Are a Wild Card in Battleground States*, N.Y. Times, Oct. 15, 2024, at A15. And because this court chooses not to intervene, Secretary Benson is permitted to unilaterally change the rules—and potentially the outcome—of the election.

ENTERED BY ORDER OF THE COURT

*Kelly L. Stephens*

_____

Kelly L. Stephens, Clerk